848 F.2d 1068
 11 Fed.R.Serv.3d 561, 18 Envtl. L. Rep. 21,237
 SIERRA CLUB, a non-profit corporation; National Parks and
Conservation Association, a non-profit organization;
Southern Utah Wilderness Alliance, a non-profit corporation;
and The Wilderness Society, a non-profit corporation,
Plaintiffs-Appellants/Cross-Appellees,
v.
Donald P. HODEL, in his capacity as Secretary of the United
States Department of the Interior; The Department of the
Interior of the United States: The Bureau of Land
Management; Garfield County, a political subdivision of the
State of Utah, Defendants-Appellees/Cross-Appellants.
 Nos. 87-2832, 88-1130 and 88-1161.
 United States Court of Appeals,
Tenth Circuit.
 June 6, 1988.
As Amended Aug. 31, 1988.
Opinion on Rehearing Aug. 31, 1988.
 
 Lori Potter, Sierra Club Legal Defense Fund, Inc., Denver, Colo. (Wayne G. Petty of Moyle & Draper, Salt Lake City, Utah, with her on the briefs), for plaintiffs-appellants/cross-appellees.
 Robert L. Klarquist, Atty., Dept. of Justice, Washington, D.C. (Roger J. Marzulla, Acting Asst. Atty. Gen., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D.C., Brent D. Ward, U.S. Atty., and Joseph W. Anderson, Asst. U.S. Atty., Salt Lake City, Utah, with him on the briefs), for defendants-appellees/cross-appellants Donald P. Hodel and Dept. of the Interior: Bureau of Land Management.
 Craig C. Halls, San Juan Co. Atty., Monticello, Utah, for amicus curiae San Juan County, Utah.
 Ronald W. Thompson of Thompson, Hughes & Reber, St. George, Utah (Patrick Noland, Panguitch, Utah, with him on the briefs) for defendant-appellee/cross-appellant Garfield County, Utah.
 Lee Ruck, General Counsel, Nat. Ass'n of Counties, Washington, D.C., and Patrick B. Nolan, Garfield Co. Atty., Panguitch, Utah, for amicus curiae Nat. Ass'n of Counties.
 Eric Twelker and Constance E. Brooks of Mountain States Legal Foundation, Denver, Colo., for amicus curiae Mountain States Legal Foundation.
 Bill Thomas Peters of Kinghorn, Peters, Probst & Sloan, Salt Lake City, Utah, for amicus curiae Utah Ass'n of Counties.
 William J. Lockhart, Salt Lake City, Utah, filed briefs as amicus curiae.
 Before LOGAN and SEYMOUR, Circuit Judges, and BARRETT, Senior Circuit Judge.
 LOGAN, Circuit Judge.
 
 
 1
 * The Burr Trail winds for sixty-six miles through federally owned land in the rugged, dramatic terrain of southern Utah's Garfield County. Connecting the town of Boulder with Lake Powell's Bullfrog Basin Marina, the road at various points traverses across or next to unreserved federal lands, two wilderness study areas, the Capitol Reef National Park, and the Glen Canyon National Recreation Area. The trail has hosted a variety of uses: during the late 1800s and early 1900s to drive cattle, sheep and horses to market; around 1918 to facilitate oil exploration; and since the 1930s for various transportation, emergency, mineral, agricultural, economic development, and tourist needs. Garfield County (the County) has maintained the Burr Trail since the early 1940s. The combination of public uses and county maintenance has created a right-of-way in favor of Garfield County, pursuant to Congress' grant of public land in R.S. 2477. See Sec. 8 of the Act of July 26, 1866, 14 Stat. 253, formerly Sec. 2477 of the Revised Statutes of the United States, repealed by Federal Land Policy Management Act of 1976, Sec. 706(a), Pub.L. No. 94-579, 90 Stat. 2793.[1]
 
 
 2
 The current controversy arises out of the County's immediate plan to improve the western twenty-eight miles of the Burr Trail from an essentially one-lane dirt road into an improved two-lane graveled road.[2] Part of this section of the trail runs between two federally protected wilderness study areas (WSAs), the Steep Creek and the North Escalante Canyons WSAs[3]. Asserting concern over the impact that construction and subsequent increased travel will have on plants, animals, and archaeological sites in the area, Sierra Club and other environmental groups (collectively referred to as Sierra Club) sued the Secretary of the United States Department of the Interior and a division thereunder, the Bureau of Land Management (collectively referred to as federal defendants or as BLM) and Garfield County. The complaint's essential allegations are that:
 
 
 3
 (1) the County's proposed improvements will extend the actual roadway beyond the right-of-way and encroach upon federal land;
 
 
 4
 (2) the County has not received authorization for this encroachment from the Bureau of Land Management (BLM), as required by the Federal Land Policy Management Act of 1976 (FLPMA), supra, codified, as amended at 43 U.S.C. Sec. 1701 et seq.;
 
 
 5
 (3) the improvements will unnecessarily and unduly degrade adjacent wilderness study areas and will impair the WSAs' suitability for designation as wilderness; and
 
 
 6
 (4) BLM has failed to study the environmental impact of the construction in violation of the National Environmental Policy Act of 1969 (NEPA), Pub.L. No. 91-190, 83 Stat. 852, codified as amended at 42 U.S.C. Sec. 4321.
 
 
 7
 The complaint requests an injunction against construction until the County and BLM comply with FLPMA and NEPA.
 
 
 8
 The district court enjoined the County's project pending trial. After trial, the district court agreed almost entirely with the County and BLM and authorized the construction. See Sierra Club v. Hodel, 675 F.Supp. 594 (D.Utah 1987). It found that the entire proposal fell within the County's right-of-way, but that one part of the proposal--in the riparian area known as The Gulch--threatened the wilderness study areas. To protect The Gulch, the district court ordered the County to seek from BLM a FLPMA permit to relocate part of the road outside the existing right-of-way. It further ordered BLM to conduct studies of plant life along the trail, to monitor the construction in areas with archaeological sites, and to direct alterations in the plan where necessary to preserve plant life or archaeological sites. The court denied Garfield County's request for damages resulting from construction delays. The court then dissolved the preliminary injunction. Both sides appealed portions of the district court's rulings. This court stayed the dissolution of the preliminary injunction pending appeal.
 
 
 9
 On appeal we must consider two jurisdictional questions: (1) whether BLM's self-described refusal to act under FLPMA is committed to agency discretion under the Administrative Procedure Act and thus exempt from judicial review; and (2) whether Sierra Club has rights of action against BLM and Garfield County.[4] On the merits, we must consider whether and to what extent (1) the County's plans fall within their R.S. 2477 right-of-way; (2) the plans affect adjacent WSAs; (3) major federal action as defined in NEPA is involved by BLM's activities or responsibilities under FLPMA; and (4) BLM must conduct further environmental studies under NEPA. We also must determine whether the district court erred in ordering the County to apply for a permit to relocate part of the road and to make an inventory of plant life along the Burr Trail. Finally, we must address the district court's denial of damages for the construction delays caused by the suit.
 
 II
 A. Reviewability of BLM's Refusal to Act
 
 10
 BLM raises a threshold jurisdictional question. Under the Administrative Procedure Act (APA), 5 U.S.C. Sec. 701 et seq., administrative actions generally are subject to judicial review. Courts, however, cannot review actions or, as in this case, refusals to act which are "committed to agency discretion by law." 5 U.S.C. Sec. 701(a)(2). BLM alleges that its decision not to attempt to enjoin or regulate the County's plans fits within the Sec. 701(a)(2) exception to judicial review.
 
 
 11
 Sierra Club has asserted that FLPMA imposes a duty on BLM to require Garfield County to prove its entitlement to a right-of-way before BLM can allow the County to begin "significant construction," and "to prevent the trespass of Garfield County and Harper Excavating, Inc. if Garfield County does not have a right-of-way." Complaint, I R. tab 1 at p 64. BLM characterizes Sierra Club's complaint as a request for investigative and enforcement action, which FLPMA requires only if "necessary to prevent unnecessary or undue degradation of the lands." FLPMA Sec. 302(b), codified at 43 U.S.C. Sec. 1732(b). According to BLM, the statutory language "unnecessary or undue degradation" " 'breath[es] discretion at every pore.' " Brief of Federal Defendants at 17 (quoting Strickland v. Morton, 519 F.2d 467, 469 (9th Cir.1975)). BLM contends that FLPMA lacks a statutory standard capable of judicial application, and thus that its decisions whether to enjoin private activities which affect public lands fall beyond the purview of judicial review.
 
 
 12
 In general, in the absence of an express statutory prohibition of judicial review (which would invoke APA Sec. 701(a)(1)), an agency bears "the heavy burden of overcoming the strong presumption that Congress did not mean to prohibit all judicial review of [the agency's] decision." Dunlop v. Bachowski, 421 U.S. 560, 567, 95 S.Ct. 1851, 1857, 44 L.Ed.2d 377 (1975). In Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), the Supreme Court stated that Sec. 701(a)(2)'s judicial review exemption applies only "in those rare instances where 'statutes are drawn in such broad terms that in a given case there is no law to apply.' " Id. at 410, 91 S.Ct. at 820 (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)).
 
 
 13
 When, however, an agency decides not to take a requested enforcement action, an opposite presumption applies. In Heckler v. Chaney, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), several death-row inmates petitioned the Food and Drug Administration (FDA) to study the safety and effectiveness of drugs used for lethal injections. The FDA refused to take enforcement action, and the Supreme Court held that the FDA's decision was exempt from judicial review. The Court relied on the oft-stated principle that an "agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." Id. at 831, 105 S.Ct. at 1656. In reaching this result, the Court set forth the general rule that an "agency's decision not to take enforcement actions should be presumed immune from judicial review under Sec. 701(a)(2)." Id. at 832, 105 S.Ct. at 1656. The Court noted, however, "that the decision is only presumptively unreviewable; the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." Id. at 832-33, 105 S.Ct. at 1656 (footnote omitted).
 
 
 14
 The Court in Chaney reconciled Dunlop by distinguishing the cases factually. The Supreme Court reasoned that the statute in Chaney (the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. Sec. 301 et seq.) committed "complete discretion to the Secretary [of Health and Human Services] to decide how and when" the injunctive, criminal, and investigative remedies of the statute should be exercised. Chaney, 470 U.S. at 835, 105 S.Ct. at 1658. Conversely, the statute in Dunlop (the Labor-Management Reporting and Disclosure Act, 29 U.S.C. Sec. 481 et seq.) "withdrew discretion from the agency and provided guidelines for exercise of its enforcement power." Id. at 834, 105 S.Ct. at 1657. Dunlop involved no analog to "an unreviewable exercise of prosecutorial discretion." Dunlop, 421 U.S. at 567 n. 7, 95 S.Ct. at 1857 n. 7 (cited in Chaney, 470 U.S. at 834, 105 S.Ct. at 1657). Dunlop and Chaney therefore both stand for the proposition that judicial review is available if "Congress has provided us with 'law to apply.' " Id. at 834, 105 S.Ct. at 1657.
 
 
 15
 Thus, even though BLM's position in this case perhaps could be characterized as a decision not to take enforcement action, that decision is nonetheless reviewable. Like the statute in Dunlop, and unlike the statute in Chaney, FLPMA provides "law to apply." FLPMA assigns to the Department of the Interior the responsibility to define the boundaries of Wilderness Study Areas, see id. Secs. 201(b), 603(a), 43 U.S.C. Secs. 1711(b), 1782(a), and, before their designation or nondesignation as wilderness, to manage WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness ... [and] by regulation or otherwise [to] take any action required to prevent unnecessary or undue degradation...." Id. at Sec. 603(c), 43 U.S.C. Sec. 1782(c). Further, the duty to define and protect "roadless" areas of "more than 5,000 acres" "having ... wilderness characteristics," see Wilderness Act of 1964, Pub.L. No. 88-577, 78 Stat. 890, codified at 16 U.S.C. Sec. 1131 et seq., as incorporated by FLPMA Sec. 603(a), imposes a definite standard on BLM.[5]
 
 
 16
 Sierra Club alleges that BLM has refused to take action which would prevent a road from invading and redefining the boundaries of two WSAs. The federal courts are capable of determining whether a WSA has remained "roadless," and whether the boundaries of public lands and rights-of-way will be breached. A court can measure whether the improvement of the Burr Trail will "impair the suitability of [WSAs] for preservation as wilderness" or will cause "unnecessary or undue degradation." BLM's characterization of its nonaction as an "enforcement" decision does not preclude judicial review.
 
 B. Right to Sue BLM and the County
 
 17
 BLM asserts another jurisdictional argument: that FLPMA does not create a private right of action against BLM and the County.[6] BLM frames its analysis in terms of the four-factor test set out in Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975), arguing that none of the four factors are met in this case.
 
 
 18
 We do not here decide whether FLPMA creates a private cause of action, because Sierra Club does not rely upon that approach. Rather, it contends that the Administrative Procedure Act (APA), 5 U.S.C. Secs. 701-706, expressly confers a right of action. "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action ..., is entitled to judicial review thereof." APA Sec. 10, 5 U.S.C. Sec. 702. We have already discussed and found inapplicable the only exceptions to this rule: (a) when a statute precludes judicial review, id. Sec. 701(a)(1), and (b) when the action is committed to agency discretion by law, id. Sec. 701(a)(2).
 
 
 19
 Section 702 of the APA permits actions against an agency even when there is not an implied private right of action. See Chrysler Corp. v. Brown, 441 U.S. 281, 317, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979). Thus, Sierra Club has the right to sue BLM under Sec. 702 even if it does not have a private right of action under FLPMA. See California v. Watt, 683 F.2d 1253, 1270 (9th Cir.1982) (allowing APA action in environmental case in which no implied private right of action existed under Coastal Zone Management Act), rev'd on other grounds, 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). Cf. Humboldt County v. United States, 684 F.2d 1276, 1282 n. 7 (9th Cir.1982) (upholding right to sue under Sec. 702 over closing of alleged R.S. 2477 road); City & County of Denver v. Bergland, 695 F.2d 465, 473-75 (10th Cir.1982) (upholding APA action in case involving FLPMA's effect on rights-of-way granted under the Act of February 1, 1905, 33 Stat. 628).
 
 
 20
 The more difficult question is whether Sierra Club can reach the County in this action. By its terms, Sec. 702 neither permits nor prohibits suits against nonagency defendants who, by the agency's alleged misdeeds, have benefited at the plaintiffs' expense. We know of no cases explicitly permitting a private suit under Sec. 702 against a nonagency defendant, even in a case such as this in which the nonfederal actor, by its unrestrained actions, could defeat the objectives sought in the suit against the agency.
 
 
 21
 Sierra Club argues that the device of permissive joinder under Rule 20 of the Federal Rules of Civil Procedure permits it to seek injunctive relief against the County, and cites as authority League to Save Lake Tahoe v. Tahoe Regional Planning Agency, 558 F.2d 914, 917-18 (9th Cir.1977). In that case, an environmental group sued both a state planning agency and two developers, alleging that a congressionally sanctioned interstate compact had been violated by a project proposed by the developers and approved by the agency. The developers argued that the plaintiff failed to state a claim against them. The Ninth Circuit nevertheless found that joinder of the defendant developers was necessary under Rule 20, "in order to properly afford complete relief to appellants. Such joinder in this case promotes trial convenience and prevents the possibility of multiple lawsuits." League to Save Lake Tahoe, 558 F.2d at 918.
 
 
 22
 The facts of this case closely parallel League to Save Lake Tahoe. In both, an environmental group alleges that a land management authority has violated a federal duty owed members of the group. In both, the environmental group seeks to enjoin a third-party developer from despoiling the land during the pendency of the dispute between the environmental group and the agency. In neither case is it clear whether the environmental group has an original cause of action against the developer, but in both cases it is apparent that a decision favorable to the environmental group would impose a duty on the respective agency to enjoin the developer. In the formal alignment of the parties, the developers are denoted as defendants, but substantively they are third-party defendants who could have been impleaded by the federal agencies.
 
 
 23
 While we concur in the Ninth Circuit's result in League to Save Lake Tahoe, we subscribe to different reasoning. If Sierra Club had not joined Garfield County as a party, then this would be a paradigm case for applying Fed.R.Civ.P. 19. Under Rule 19(a), an absent party "shall be joined" if:
 
 
 24
 "(1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."
 
 
 25
 Id. These criteria abound here. Sierra Club cannot hope for complete relief if the County is not enjoined from construction during the pendency of the APA action against the federal defendants. The County claims an interest in the subject of the action, the Burr Trail, and the County's absence would impede its ability to defend the boundaries and legal uses of its right-of-way. Further, BLM would face a substantial risk of inconsistent obligations if the County, unbound by the outcome in this case, sought declaratory or other relief against BLM at variance with the orders in this case.
 
 
 26
 Rule 19(a) does not permit joinder if it will deprive the court of subject matter jurisdiction over the action. Joinder here would not defeat jurisdiction, despite Sierra Club's alleged lack of a right of action against the County. The dispute between the Sierra Club and BLM raises substantial and important issues involving the R.S. 2477 right-of-way and its scope, and whether wilderness study areas are threatened by the County's proposed improvements. BLM is required by FLPMA to enjoin activities which threaten wilderness study areas. This duty includes expansive powers: "the Secretary shall by regulation or otherwise take any action required " to protect WSAs. FLPMA Sec. 603(c), 43 U.S.C. Sec. 1782(c) (emphasis added). BLM's statutory powers clearly would encompass the ability to bring an impleader action against the County. BLM's reluctance to assume the stance of a third-party plaintiff would be irrelevant:
 
 
 27
 "The plaintiff has the right to 'control' his own litigation and to choose his own forum. This 'right' is, however, like all other rights, 'defined' by the rights of others. Thus the defendant has the right to be safe from needless multiple litigation and from incurring avoidable inconsistent obligations. Likewise the interests of the outsider who cannot be joined must be considered. Finally there is the public interest and the interest the court has in seeing that insofar as possible the litigation will be both effective and expeditious."
 
 
 28
 Schutten v. Shell Oil Co., 421 F.2d 869, 873 (5th Cir.1970). It is of no moment that the County formally has been aligned as a defendant rather than a third-party defendant. Substantively, the relief sought and the defenses raised are identical; no party has been prejudiced; and neither the County nor BLM has raised an objection to the misalignment. We thus conclude that, if not joined originally, the County would have been brought in under Rule 19.
 
 III
 A. Background on Right-of-Way Issue
 
 29
 From 1866 until its repeal by FLPMA in 1976, R.S. 2477 granted a "right of way for the construction of highways over public lands, not reserved for public uses...." According to regulations issued by the Department of the Interior and, after 1946, the Bureau of Land Management, a right-of-way could be obtained without application to, or approval by, the federal government. See 43 C.F.R. Sec. 2822.1-1 (1979). See also 43 C.F.R. Sec. 244.55 (1939). Rather, "[t]he grant referred to in [R.S. 2477] [became] effective upon the construction or establishing of highways, in accordance with the State laws." 43 C.F.R. Sec. 244.55 (1939).
 
 
 30
 FLPMA, passed in 1976, vests the Secretary of the Interior with broad authority to manage the federal government's vast land holdings. The statute departs from the federal government's earlier policy of giving away public lands, in favor of a philosophy of retention and management to maximize the multitudinous interests in the lands. To that end, FLPMA repeals R.S. 2477 and its open-ended grant of rights-of-way over public lands while explicitly protecting R.S. 2477 rights-of-way in existence on the date of FLPMA's passage. See FLPMA Secs. 509(a), 701(a), and 701(h), codified respectively at 43 U.S.C. Secs. 1769(a) and 1701, Savings Provisions (a) and (h). Any new rights-of-way must be obtained under the stricter provisions of FLPMA Subchapter V, codified at 43 U.S.C. Secs. 1761-1771. FLPMA also requires the Secretary of the Interior to identify and protect wilderness study areas (WSAs)[7] pending executive decisions on whether to accept WSAs into the Federal Wilderness Preservation System. FLPMA Sec. 603, 43 U.S.C. Sec. 1782.
 
 
 31
 A major part of this case involves the interplay between FLPMA and preexisting R.S. 2477 grants, such as the Burr Trail. Sierra Club maintained in the district court that the County's plans for the right-of-way conflict with FLPMA in two ways. Sierra Club first claimed that the plans require significant deviations from the existing right-of-way, constituting, in effect, an attempt to obtain a new right-of-way, and thereby triggering the permit requirements of FLPMA Subchapter V. Sierra Club sought to enjoin the improvements on the Burr Trail until the County obtains a FLPMA permit. Second, Sierra Club contended that the improvements will cause the unnecessary and undue degradation of the Steep Creek and North Escalante Canyons WSAs[8] and will impair their suitability for designation as wilderness, in violation of the Secretary's duties under FLPMA Sec. 603(c). Sierra Club argued not only that the construction activities and future increased traffic themselves would disturb the WSAs, but also that widening the trail to a twenty-four-foot, two-lane road would exceed the scope of the right-of-way.[9]
 
 
 32
 The district court rejected most of Sierra Club's arguments. It found a right-of-way under Utah law which was broad enough in scope to incorporate all of the planned improvements; thus, BLM approval for "new" rights-of-way was unnecessary, since only the preexisting right-of-way was involved. Further, the district court found no threatened impairment of the WSAs' suitability for wilderness designation. Finally, the district court found, with one exception, that the improvements would not cause "unnecessary or undue degradation" to the WSAs. The exception was the court's determination that proposed improvements in a riparian area of the Burr Trail known as "The Gulch" would cause unnecessary degradation to the WSAs. Based on a BLM manager's testimony, the court decided that the County's improvement of The Gulch portion of the trail would cause less degradation of the WSAs if it were moved out of the County's right-of-way and onto an immediately adjacent formation--"the bench"--located on BLM land. The court ordered the County to apply to BLM for a permit to move the road onto the bench.
 
 
 33
 On appeal, Sierra Club raises the same arguments, although it now concedes the existence--but not the scope--of the County's right-of-way.[10] The defendants reply that (1) the district court correctly relied on Utah law to determine the scope of the right-of-way; (2) under Utah law, all of the proposed improvements fall within the County's right-of-way and thus are beyond the reach of FLPMA; (3) to the extent that improvements within the preexisting right-of-way would impair the suitability of a WSA for designation as wilderness, the district court properly ruled BLM lacks authority to prevent such impairment; and (4) BLM and the court do not have the authority to replace the County's R.S. 2477 right-of-way in The Gulch with a new FLPMA right-of-way on the bench. We treat the competing contentions.
 
 B. Controlling Law
 
 34
 BLM and Garfield County propose a two-part standard for measuring the scope of an R.S. 2477 right-of-way:
 
 
 35
 a) the baseline is the historical extent of use, i.e., the beaten path both as it is now and once existed; plus
 
 
 36
 b) the right to deviate from the beaten path when "reasonable and necessary" to meet the exigencies of increased travel.
 
 
 37
 This right to deviate when "reasonable and necessary" is derived entirely from Utah case law.
 
 
 38
 Sierra Club, in contrast, advocates an "actual construction" standard derived from the federal R.S. 2477 statute, which granted a right-of-way for "the construction of highways." This standard would measure an R.S. 2477 right-of-way entirely by the actual construction which the rightholder has performed. "Construction" indisputably does not include the beaten path; rather there must be some evidence of maintenance, e.g., grading, drainage ditches, culverts.
 
 
 39
 The salient issue is whether the scope of R.S. 2477 rights-of-way is a question of state or federal law. The statute itself does not specify whether state or federal law should define the scope of rights-of-way granted thereunder. There is no legislative history to R.S. 2477, and the legislative context of R.S. 2477 sheds little light. R.S. 2477 was originally enacted as section 8 of the Act of July 26, 1866. Congress explicitly adopted state or local law as the rule of decision for sections 1, 2, 5 and 9 of the 1866 Act; just as explicitly, Congress asserted the applicability of federal laws or regulations in sections 7, 10, and 11. The silence of section 8 reflects the probable fact that Congress simply did not decide which sovereign's law should apply.
 
 
 40
 In the face of such congressional silence, the interpretation given by the federal agency with dominion over the statute's subject matter carries great weight:
 
 
 41
 " 'The power of an administrative agency to administer a congressionally created ... program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress.' Morton v. Ruiz, 415 U.S. 199, 231 [94 S.Ct. 1055, 1072, 39 L.Ed.2d 270] (1974).... Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency."
 
 
 42
 Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843-44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984) (footnote omitted).
 
 
 43
 The federal regulations heavily support a state law definition. At least since 1938, the Secretary of the Interior has interpreted R.S. 2477 as effecting the grant of a right-of-way "upon the construction or establishing of highways, in accordance with State laws...." 43 C.F.R. Sec. 244.55 (1939). BLM, the Secretary's designee, has followed this interpretation consistently and has incorporated it in the Bureau's manual: "State law specifying widths of public highways within the State shall be utilized by the authorized officer to determine the width of the RS 2477 grant." BLM Manual, Rel. 2-229 at 2801.48B, Brief of Sierra Club, Attachment D. Especially when an agency has followed a notorious, consistent, and long-standing interpretation, it may be presumed that Congress' silence denotes acquiescence:
 
 
 44
 "[G]overnment is a practical affair, intended for practical men. Both officers, lawmakers, and citizens naturally adjust themselves to any long-continued action of the Executive Department, on the presumption that unauthorized acts would not have been allowed to be so often repeated as to crystallize into a regular practice. That presumption is not reasoning in a circle, but the basis of a wise and quieting rule that, in determining the meaning of a statute or the existence of a power, weight shall be given to the usage itself,--even when the validity of the practice is the subject of investigation."
 
 
 45
 United States v. Midwest Oil Co., 236 U.S. 459, 472-73, 35 S.Ct. 309, 312-13, 59 L.Ed. 673 (1915).
 
 
 46
 Sierra Club challenges this reliance on BLM's interpretation. First, it challenges the consistency of BLM's interpretation of R.S. 2477. It cites a 1980 opinion letter from the Solicitor of the Interior Department stating that "The question of whether a particular highway has been legally established under R.S. 2477 remains a question of federal law." Opinion Letter of Interior Department Solicitor at 4 (April 28, 1980) (Opinion Letter), Brief of Sierra Club, Attachment B.[11] While this letter admits of at least three possible interpretations, none aids Sierra Club here. One interpretation, which Sierra Club propounds, is that state law plays no role whatsoever in the determination of the existence and scope of R.S. 2477 rights-of-way. This position, however, clearly conflicts with more than four decades of agency precedent, subsequent BLM policy as expressed in the BLM Manual, and over a century of state court jurisprudence. So viewed, the opinion letter would be highly suspect and would deserve little weight. A second reading is that the Solicitor is stating that, as a matter of federal law, the use of the word "construction" in R.S. 2477 imposes actual construction as a baseline requirement for perfection of a right-of-way, a requirement which state law can interpret but cannot disregard or emasculate. See Opinion Letter at 5-11. This reading of the Solicitor's opinion does not help Sierra Club, however, as it speaks only to what is necessary to perfect an R.S. 2477 right, not the scope of such a right once perfected. Sierra Club does not dispute that an R.S. 2477 right-of-way for the Burr Trail was perfected before passage of FLPMA, even under an "actual construction" standard for perfection. The third possible reading of this letter would return us to BLM's regulations: as a matter of federal law, state law has been designated as controlling. This third reading, we think, is most consonant with reason and precedent.
 
 
 47
 Sierra Club also contends that decisions in this and the Ninth Circuit reject the use of state law in R.S. 2477 cases, citing United States v. Gates of the Mountains Lakeshore Homes, Inc., 732 F.2d 1411, 1413 (9th Cir.1984), and City & County of Denver v. Bergland, 517 F.Supp. 155, 190 n. 45 (D.Colo.1981), aff'd in part, rev'd in part on other grounds, 695 F.2d 465 (10th Cir.1982). Neither of these cases supports Sierra Club. The holding of Gates of the Mountains is quite narrow, simply that R.S. 2477 is inapplicable to rights-of-way for utility lines because Congress has separately legislated in that area. 732 F.2d at 1413. Indeed, Gates of the Mountains acknowledges in dicta:
 
 
 48
 "The scope of a grant of federal land is, of course, a question of federal law. United States v. Oregon, 295 U.S. 1, 28 [55 S.Ct. 610, 621, 79 L.Ed. 1267] ... (1935). But in some instances 'it may be determined as a matter of federal law that the United States has impliedly adopted and assented to a state rule of construction as applicable to its conveyances.' Id."
 
 
 49
 732 F.2d at 1413. Bergland, as well, is too narrow to be on point, insofar as it deals with the choice of law under a 1905 act of Congress, and not with R.S. 2477. See 517 F.Supp. at 190 n. 45.
 
 
 50
 The next of Sierra Club's arguments is the most troubling. It contends that a "reasonable and necessary" standard violates FLPMA's policy of "freezing" rights of way at their October 21, 1976 width. See FLPMA Secs. 509(a), 701(a) and 701(h), 43 U.S.C. Secs. 1769(a), 1701 Savings Provisions (a) and (h). Although these savings provisions are phrased in terms of protecting existing "rights" and not existing "widths," Sierra Club's point is a good one. The Bullfrog Marina could become so popular that an eight-lane superfreeway becomes "reasonable and necessary." The superfreeway would represent an expansion of the right-of-way far beyond the use and width existing at the time of FLPMA's passage, and such expansion arguably would violate the "freeze" on existing rights. This concern, however, addresses not the choice of governing law, but the construction this court will put on it, which we discuss below.
 
 
 51
 Sierra Club urges finally that the analytic framework of Wilson v. Omaha Indian Tribe, 442 U.S. 653, 99 S.Ct. 2529, 61 L.Ed.2d 153 (1979), supports the use of federal law. Under this analysis, the choice of federal or local law depends on three factors: "whether there is need for a nationally uniform body of law to apply in situations comparable to this, whether application of state law would frustrate federal policy or functions, and the impact a federal rule might have on existing relationships under state law." Id. at 672-73, 99 S.Ct. at 2540; see also United States v. Kimbell Foods, Inc., 440 U.S. 715, 727-28, 99 S.Ct. 1448, 1457-58, 59 L.Ed.2d 711 (1979); Jicarilla Apache Tribe v. Andrus, 687 F.2d 1324, 1341 n. 11a (10th Cir.1982).[12]
 
 
 52
 The first of the Wilson factors--the need for uniformity--provides only minimal support for the choice of federal law. FLPMA admittedly embodies a congressional intent to centralize and systematize the management of public lands, a goal which might be advanced by establishing uniform sources and rules of law for rights-of-way in public lands. The policies supporting FLPMA, however, simply are not relevant to R.S. 2477's construction. It is incongruous to determine the source of interpretative law for one statute based on the goals and policies of a separate statute conceived 110 years later. Rather, the need for uniformity should be assessed in terms of Congress' intent at the time of R.S. 2477's passage. Cf. Leo Sheep Co. v. United States, 440 U.S. 668, 681-82 & n. 18, 99 S.Ct. 1403, 1410-11 & n. 18, 59 L.Ed.2d 677 (1979). Sierra Club advances no policies from 1866 that would demand uniformity.
 
 
 53
 The second Wilson factor--whether application of state law would frustrate federal policy or functions--favors the continued use of state law. The adoption of a federal definition of R.S. 2477 roads would have very little practical value to BLM. State law has defined R.S. 2477 grants since the statute's inception. A new federal standard would necessitate the remeasurement and redemarcation of thousands of R.S. 2477 rights-of-way across the country, an administrative duststorm that would choke BLM's ability to manage the public lands.
 
 
 54
 The third Wilson factor strongly supports the use of state law, as imposing a federal definition of R.S. 2477 rights-of-way would undermine the local management of roads across the western United States. Although "[n]o direct statistics exist cataloging R.S. 2477 public highways," such roads are major components of the transportation systems in most western states. See Brief of Amicus Curiae National Association of Counties at 4-7. Over the past 125 years, each western state has developed its own state-based definition of the perfection or scope of the R.S. 2477 grant, either by explicitly declaring R.S. 2477 to incorporate state law or by simply expounding its own law.[13] We are not aware of any state that even considered the possibility of a federal rule. That a change to a federal standard would adversely affect existing property relationships squarely refutes Sierra Club's allegation that the use of a state law standard unfairly prejudices the federal government. R.S. 2477 rightholders, on the one hand, and private landowners and BLM as custodian of the public lands, on the other, have developed property relationships around each particular state's definition of the scope of an R.S. 2477 road. The replacement of existing standards with an "actual construction" federal definition would disturb the expectations of all parties to these property relationships.
 
 
 55
 Having considered the arguments of all parties, we conclude that the weight of federal regulations, state court precedent, and tacit congressional acquiescence compels the use of state law to define the scope of an R.S. 2477 right-of-way.
 
 C. Scope of the Right-of-Way
 
 56
 Determining the scope of the Burr Trail right-of-way requires us to ascertain Utah law and to apply that law to the uses of the Burr Trail.
 
 
 57
 A Utah statute enacted in 1963 provides: "The width of rights-of-way for public highways shall be such as the highway authorities of the state, counties, cities or towns may determine for such highways under their respective jurisdiction." Utah Code Ann. Sec. 27-12-93 (Replacement Volume 1984). On June 15, 1987, the Garfield County Commission acted for apparently the first time under Sec. 27-12-93, establishing a uniform width of 100 feet for all R.S. 2477 roads in the County. This determination has no effect, however, for FLPMA preserved only preexisting rights-of-way as they existed on the date of passage, October 21, 1976.[14] Thus, Garfield County's rights, as they existed under Utah law on that date, are the maximum rights it can exercise today. Garfield County, not having established a right-of-way width under the 1963 act before passage of FLPMA in 1976, is limited, we hold, to the width permitted by state law as of that date.
 
 
 58
 The district court held that Utah case law defined the width of an R.S. 2477 right-of-way "to be that which is reasonable and necessary for the type of use to which the road has been put." 675 F.Supp. at 607 (citing Lindsay Land & Live Stock Co. v. Churnos, 75 Utah 384, 285 P. 646, 649 (1929)). The district court noted further that the Utah Supreme Court
 
 
 59
 "has also said that rights-of-way should not be restricted to the actual beaten path, but should be widened to meet the exigencies of increased travel. More specifically, they should be wide enough to allow travelers to pass each other. Whitesides v. Green, 13 Utah 341, 44 P. 1032, 1033 (1896)."
 
 
 60
 675 F.Supp. at 607. Thus, under Utah common law, the road could be widened as necessary to meet the exigencies of increased travel, at least to the extent of a two-lane road.
 
 
 61
 We believe the "reasonable and necessary" standard must be read in the light of traditional uses to which the right-of-way was put. Surely no Utah case would hold that a road which had always been two-lane with marked and established fence lines, could be widened to accommodate eight lanes of traffic without compensating the owners of property that would be destroyed to accommodate the increased road width. Rights-of-way are a species of easements and are subject to the principles that govern the scope of easements. See J. Cribbett, Principles of the Law of Property at 273-74 (1962). Utah adheres to the general rule that the owners of the dominant and servient estates "must exercise [their] rights so as not unreasonably to interfere with the other." Big Cottonwood Tanner Ditch Co. v. Moyle, 109 Utah 213, 174 P.2d 148, 158 (1946). See Nielson v. Sandberg, 105 Utah 93, 141 P.2d 696, 701 (1943) (an easement is limited to the original use for which it was acquired).
 
 
 62
 Applying the "reasonable and necessary" standard in light of traditional uses does not mean, however, that the County's right-of-way is limited to the uses to which the Burr Trail was being put when it first became an R.S. 2477 road. R.S. 2477 was an open-ended and self-executing grant. Under the BLM regulations, the right-of-way became effective upon construction or establishment by the state, see, e.g., 43 C.F.R. Sec. 2822.2-1 (1979); and "no action on the part of the [federal] Government [was] necessary." See, e.g., id. at Sec. 2822.1-1. Because the grantor, the federal government, was never required to ratify a use on an R.S. 2477 right-of-way, each new use of the Burr Trail automatically vested as an incident of the easement. Thus, all uses before October 21, 1976, not terminated or surrendered, are part of an R.S. 2477 right-of-way. As there is no contention or evidence of termination or surrender in this case, the County's right-of-way as of the repeal of R.S. 2477 on October 21, 1976, was that which was "reasonable and necessary" for the Burr Trail's preexisting uses.
 
 
 63
 The district court opinion recited several pre-October 21, 1976, uses: driving livestock; oil, water, and mineral development; transportation by County residents between Bullfrog and other cities in Garfield County; and, at least since 1973, access for tourists to Bullfrog Marina on Lake Powell. 675 F.Supp. at 597 & n. 4. These findings of fact are not clearly erroneous and must be affirmed. Fed.R.Civ.P. 52. Thus, the scope of Garfield County's right-of-way is that which is reasonable and necessary to ensure safe travel for the uses above-mentioned, including improving the road to two lanes so travelers could pass each other.
 
 
 64
 We do not read the district court opinion as deciding the precise width of the easement or that it could be widened in the future to accommodate perceived needs developing after 1976. The court found only that the width was sufficient to accommodate the contemplated widening to two lanes proposed by the County. We do not have before us sufficient facts to determine whether a reasonable need existed in 1976 with respect to the Burr Trail to require some particular width beyond that needed for the presently planned improvements. See Hunsaker v. State, 29 Utah 2d 322, 509 P.2d 352 (1973). Thus, we also do not decide the precise width of this road easement held by the County.
 
 D. The County's Proposal
 
 65
 Sierra Club alleges that the County's proposed improvements will deviate illegally from the scope of the Burr Trail right-of-way in two ways: (a) they will extend the roadway and its accoutrements (e.g., ditches, culverts) physically beyond the boundaries of the existing right-of-way; and (b) they will make the road suitable for intended uses not in existence on October 21, 1976, and therefore not protected by FLPMA's savings clauses. Sierra Club's argument depends largely on an "actual construction" definition of the right-of-way; the correct "reasonable and necessary" definition fixed as of October 21, 1976, which the district court applied, and which we have affirmed, seriously undercuts Sierra Club's position.
 
 
 66
 The district court determined that constructing a two-lane gravel road, with adjoining culverts and ditches, is reasonable and necessary to assure safe travel on the Burr Trail. 675 F.Supp. at 606-07. The court condoned the proposed drainage ditches and culverts as "[s]ound engineering practice" and hence "part of the reasonable and necessary use." Id. at 607. "[E]ven allowing for these drainage ditches, the project falls within the right-of-way as prescribed by Utah law." Id. The district court further found that "the project is entirely consistent with the historic physical alignment of the road. The proposed deviations [from the established roadway] are minor in relation to the realignments which have been made in the past in response to flooding and rock slides." Id. Finally, the intended use for the proposed road--the promotion of economic development--was found to square with the Burr Trail's historic uses, including service as "a vital link between the county's major centers of activity," id. at 608.
 
 
 67
 As the district court correctly notes, Tenth Circuit precedent requires "that the initial determination of whether activity falls within an established right-of-way is to be made by the BLM and not the court". 675 F.Supp. at 606 (citing City & County of Denver v. Bergland, 695 F.2d at 481). The district court based its findings of fact largely on the testimony and exhibits of several BLM experts, which in turn were based on an extensive field study by BLM of the proposed improvements. The field study resulted in a BLM staff report in which the BLM District Manager found that the entire proposal fell within the right-of-way.
 
 
 68
 On appeal, we will not disturb findings of fact unless clearly erroneous. As Sierra Club does not demonstrate clear error in the district court's finding that the proposed improvements fall within the scope of the right-of-way, we afffirm it.
 
 E. Impact on Wilderness Study Areas
 
 69
 Approximately thirty percent of the proposed improvements will occur on sections of the Burr Trail that are bounded by two wilderness study areas. As the district court explained:
 
 
 70
 "Wilderness Study Areas are governed by [FLPMA], 43 U.S.C. Secs. 1701 et seq. Under the Act, all roadless areas of 5,000 acres or more which meet the criteria of the 1964 Wilderness Act are to be designated WSAs. [To qualify as a WSA under the Wilderness Act, the area must have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable, and must have outstanding opportunities for solitude or a primitive and unconfined type of recreation. 16 U.S.C. Sec. 1131 et seq.] Within fifteen years, the BLM is to review each WSA and recommend to the President whether it should be classified as a Wilderness Area. Ample opportunity for public comment exists throughout this recommendation period. The President will then make his own recommendation to Congress which makes the final decision. [FLPMA Sec. 603,] 43 U.S.C. Sec. 1782."
 
 
 71
 675 F.Supp. at 608 (bracketed material appeared as footnote in district court opinion). FLPMA expressly requires the Secretary to protect WSAs during the review process, by creating two distinct duties of conservation: (1) a "nonimpairment" duty--to manage the WSAs "in a manner so as not to impair the suitability of such areas for preservation as wilderness ...;" and (2) a "nondegradation" duty--to "take any action required to prevent unnecessary or undue degradation of the [WSAs] and their resources...." FLPMA Sec. 603(c).[15]
 
 
 72
 The Secretary's conservation duties potentially interfere with nonfederal rightholders' ability to enjoy property interests on or adjacent to WSAs. Congress partially resolved this conflict by permitting "existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976." FLPMA Sec. 603(c). Congress did not include rights-of-way in this provision, presumably because "Congress did not contemplate the presence of rights-of-way in WSAs since, by definition, WSAs are roadless areas." 675 F.Supp. at 609 n. 38. Rights-of-way nevertheless receive protection from the savings provisions in FLPMA Secs. 509(a), 701(a) and 701(h), 43 U.S.C. Sec. 1769(a); 43 U.S.C. Sec. 1701 Savings Provisions (a) and (h). It is unclear from FLPMA how these savings provisions interact with the Secretary's conservation duties under Sec. 603(c).
 
 
 73
 BLM issued regulations to address the statute's lack of clarity. See Interim Management Policy and Guidelines for Land Under Wilderness Review ("IMP"), 44 Fed.Reg. 72,014 (1979); see also, e.g., Interim Management Policy and Guidelines ("Revised IMP"), 48 Fed.Reg. 31,854 (1983) (amendments to original IMP). The IMPs establish guidelines to determine whether the use or development of private interests in public lands illegally threatens WSAs. The IMPs define three types of rights, two of which are relevant to this case: "grandfathered uses," which are the three uses--mining, grazing, and mineral leasing--explicitly protected by Sec. 603(c); and "valid existing rights," which refer to those rights protected by Sec. 701(h). See IMP, 44 Fed.Reg. at 72,015-17; Revised IMP, 48 Fed.Reg. at 31,854-55. Rights-of-way protected by FLPMA qualify as valid existing rights under the IMPs. Id.
 
 
 74
 The IMP and the Revised IMP permit impairment of WSAs resulting from activities pursued under grandfathered uses or valid existing rights:
 
 
 75
 "Valid existing rights limit the nonimpairment standard. Although the nonimpairment standard remains the norm, valid existing rights that include the right to develop may not be restricted to the point where the restriction unreasonably interferes with the enjoyment of the benefit of the right. Resolution of specific cases will depend upon the nature of the rights conveyed and the site-specific conditions involved. When it is determined that the rights conveyed can be exercised only through activities that will impair wilderness suitability, the activities will be regulated to prevent unnecessary or undue degradation. Nevertheless, even if such activities impair the area's wilderness suitability, they will be allowed to proceed."
 
 
 76
 Revised IMP, 48 Fed.Reg. at 31,854-55 (emphasis added).[16] However, these activities are subject to the rule that they may not degrade WSAs unnecessarily or unduly. 44 Fed.Reg. at 72,015; 48 Fed.Reg. at 31,855. A BLM district manager testified that BLM construes the nondegradation rule to mean that "all projects must employ the latest available technology and the least degrading alternatives." 675 F.Supp. at 610.
 
 
 77
 Relying on Sec. 603 and the IMPs, the district court held that insofar as the County's proposal was reasonable and was pursuant to a valid existing right, construction could proceed even if it impaired the adjoining WSAs' suitability for wilderness designation:
 
 
 78
 "Reasonable use of the Burr Trail includes the right to a safe, two-lane gravel road of sufficient construction to accommodate regular traffic. All of the construction now proposed is reasonable under Utah law. Thus, the BLM may restrict the project under FLPMA only if it unduly degrades the WSAs. Impairment alone is insufficient to trigger regulation."
 
 
 79
 675 F.Supp. at 609 (footnote omitted). The district court also found that the proposal would not unnecessarily or unduly degrade the WSAs, except in the riparian Gulch. As to The Gulch, the district court decided that
 
 
 80
 "traffic and periodic maintenance work in the riparian area of The Gulch will have an impact on the WSA sufficient to invoke the FLPMA requirement that all work done be the least degrading alternative.... [M]oving the road out of the riparian area in The Gulch up onto the bench on the right will result in less disturbance to the riparian habitat and will prevent flooding of the road."
 
 
 81
 Id. at 611. Because the bench sits outside the County's R.S. 2477 right-of-way, the district court ordered the County "to apply for [a FLPMA] permit and to work with BLM to develop the least degrading alternative for The Gulch area." Id.
 
 
 82
 Both sides of the controversy object to aspects of the district court's decision. Sierra Club raises two objections to the district court's decision. First, it challenges the district court's findings that the improvements are consistent with the "conditions, stipulations or limitations stated in the law ... that created the right," Revised IMP, 48 Fed.Reg. at 31,854, and that they thus qualify as valid existing rights exempt from the nonimpairment standard. Sierra Club argues:
 
 
 83
 "When the County began some construction work on the Burr Trail in 1984, the Utah State Director of BLM advised it that 'At the present time it would appear that any change of the existing alignment would not meet the non-impairment provision of IMP or the R.S. 2477 terms.' Ex. DG-55, Add. 34, at p. 1. In his letter, the State Director took exactly the same position as does Sierra Club in this case: '... it is difficult to determine how extensive maintenance can progress and not violate the terms of the grant.' Id."
 
 
 84
 Brief of Sierra Club at 35. We agree with Sierra Club that the opinion of the State Director of BLM deserves deference, but this paraphrased quotation falls short of the quantum of evidence necessary to demonstrate that the district court's factual findings were clearly erroneous, especially considering the mass of testimony and exhibits presented to the district court, as well as on-site inspection which it conducted.
 
 
 85
 Sierra Club secondly contends that "valid existing rights," including rights-of-way, are subject to the nonimpairment standard regardless of how they are exercised. This argument perhaps is supported by the plain language of Sec. 603(c), which explicitly exempts from the nonimpairment standard only the aforementioned "grandfathered uses"--mining, grazing, and mineral leasing. See also Rocky Mountain Oil & Gas Association v. Watt, 696 F.2d 734, 749 (10th Cir.1982) ("The grandfather clause provides a limited exception to the nonimpairment standard for three types of activities: mining and grazing uses and mineral leasing"). We nevertheless uphold the district court's conclusion that valid existing rights are exempt from the nonimpairment standard. In Rocky Mountain we determined only whether certain activities qualified as grandfathered uses and, if so, the permissible manner and degree of impairing exercises of those grandfathered uses. But we did not consider whether by implication other types of rights might fall within Sec. 603(c)'s exemption. Specifically, we did not have cause to reconcile FLPMA's savings provisions (Secs. 509(a), 701(a) and 701(h)) with the nonimpairment standard. We must do so in this case.
 
 
 86
 The conflict between FLPMA's savings provisions and the nonimpairment standard of Sec. 603(c) constitutes a latent ambiguity in the statute. "Where the statute is ambiguous, we must afford deference to the interpretation given the statute by the agency charged with its administration. The administrative interpretation need only be a reasonable one to be accepted, even though there may be another equally reasonable interpretation." Rocky Mountain, 696 F.2d at 745 (citing Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), and Brennan v. Occupational Safety & Health Commission, 513 F.2d 553, 554 (10th Cir.1975)). Here, BLM, in its Interim Management Policies, reconciled FLPMA's express protection of valid existing rights with the conservation duties under Sec. 603(c) by analogizing the valid existing rights to the grandfathered uses and affording them the same protections. We uphold this interpretation as a reasonable one. The accommodation reached in Sec. 603(c) for grandfathered uses reflects the common law of easements and profits. The exemption from the nonimpairment standard ensures that the federal government's new uses of its servient estate--the creation of WSAs--do not eviscerate the County's dominant estate. At the same time, Sec. 603(c) proscribes uses of the dominant estate that unreasonably interfere with (i.e., unnecessarily or unduly degrade) the servient estate. Valid existing rights such as R.S. 2477 rights-of-way also constitute preexisting easements and logically should be accorded treatment similar to grandfathered uses. We uphold the IMP's exemption of valid existing rights from the nonimpairment standard.
 
 
 87
 BLM contests the district court's order that the County apply for a FLPMA permit to move the road from The Gulch up onto the adjacent bench. BLM argues that the County should not be "compelled unwillingly to accept the markedly different rights conferred by a FLPMA right-of-way permit in place of its current R.S. 2477 grant." Brief of Federal Defendants at 38. We agree that the County cannot be forced to give up its right-of-way, and indeed FLPMA Sec. 509(a), 43 U.S.C. Sec. 1769, expressly states that. This point, however, does not defeat the order. The court held that the County's proposal for The Gulch area would unreasonably or unduly degrade the adjacent WSA; according to the record, these effects exist for nearly a mile and affect 3,430 acres of the North Escalante Canyons WSA. Based upon a BLM manager's testimony, the court found there would be less degradation of the WSA if the road were moved on to the adjacent bench located on BLM land.
 
 
 88
 Although the district court ordered the County to apply to BLM for a permit to move the road, we do not construe that order to mean that BLM may deny the permit, or impose conditions it might on ordinary right-of-way requests under FLPMA which would keep the County from improving the road. Rather, the effect of the order is to require BLM to specify where on the bench the road should be located in order that it make the least degrading impact on the WSA, the court having already determined that location on the bench would be less degrading than in The Gulch. If the results of the NEPA study which we order in Part IV so indicate, perhaps BLM can convince the district court through a motion for reconsideration that it was wrong to order the move to the bench. But we are satisfied that BLM and the court must allow the road improvement in one place or the other. So construed, we have no problems with the court's order.
 
 
 89
 Sierra Club argues that the substitution of rights-of-way is moot since the County already has applied to BLM for a FLPMA permit. We disagree. Although the County has sought such a permit, it has not abandoned its right-of-way through The Gulch.
 
 IV
 A. Applicability of NEPA
 
 90
 Sierra Club contends that BLM has not complied with Sec. 102(2)(C) of the National Environmental Policy Act (NEPA), 42 U.S.C. Sec. 4332(2)(C). NEPA seeks only to assure that environmental factors are considered in a meaningful manner before an agency commits to a major action:
 
 
 91
 "NEPA has twin aims. First, it 'places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action.' Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process. Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations. Rather, it required only that the agency take a 'hard look' at the environmental consequences before taking a major action. The role of the courts is simply to ensure that the agency has adequately considered and disclosed the environmental impact of its actions and that its decision is not arbitrary or capricious."
 
 
 92
 Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 97-98, 103 S.Ct. 2246, 2252, 76 L.Ed.2d 437 (1983) (citations omitted). To this end, NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) before undertaking "major Federal actions significantly affecting the quality of the human environment...." NEPA Sec. 102(2)(C). The presence of a major federal action triggers a duty on the part of the agency to issue a full-fledged EIS, unless it concludes that the action will have no significant environmental impact.
 
 
 93
 It is well established that "[t]he initial determination concerning the need for an EIS lies with the agency." City of Aurora v. Hunt, 749 F.2d 1457, 1468 (10th Cir.1984). We review an agency's determination for "reasonableness." The agency's findings on the threshold NEPA issues of major federal action and significant impact "must be reasonable in the light of the mandatory requirements and high standards set by the statute." Wyoming Outdoor Coordinating Council v. Butz, 484 F.2d 1244, 1249 (10th Cir.1973); see League of Women Voters v. United States Corps of Engineers, 730 F.2d 579, 585 (10th Cir.1984) (applying "the rule of reason" to major federal action); Park County Resource Council, Inc. v. United States Department of Agriculture, 817 F.2d 609, 624 (10th Cir.1987) (same); City of Aurora, 749 F.2d at 1468 (significant impact). "[T]he party challenging the agency's decision shoulders the burden" of proving unreasonableness. Park County, 817 F.2d at 621.
 
 
 94
 "Reasonableness" is essentially a legal conclusion, and thus we review de novo the district court's ruling except to the extent the ruling turns on subsidiary factual findings. We apply a clearly erroneous standard of review to factual findings by the district court based on evidence or testimony adduced at trial. Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985).
 
 
 95
 The need for NEPA study hinges on the presence of major federal action, a term which NEPA does not define. The Council on Environmental Quality (CEQ), however, has issued regulations defining the term, and, as the Supreme Court has stated, "CEQ's interpretation of NEPA is entitled to substantial deference." Andrus v. Sierra Club, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979). These regulations establish that major federal action encompasses not only actions by the federal government but also actions by nonfederal actors "with effects that may be major and which are potentially subject to Federal control and responsibility." 40 C.F.R. Sec. 1508.18 (emphasis added). "Nonfederal" major federal action refers, inter alia, to activities "regulated or approved by federal agencies," id. at Sec. 1508.18(a), including "[a]pproval of specific projects such as construction ... activities located in a defined geographic area," id. at Sec. 1508.18(b)(4). Such approval may occur through "permit or other regulatory decision as well as federal and federally assisted activites." Id. A leading commentator has observed: "[T]he distinguishing feature of 'federal' involvement is the ability to influence or control the outcome in material respects. The EIS process is supposed to inform the decision-maker. This presupposes he has judgment to exercise. Cases finding 'federal' action emphasize authority to exercise discretion over the outcome." W. Rodgers, Environmental Law 763 (1977).
 
 
 96
 The touchstone of major federal action, in the context of the case before us, is an agency's authority to influence significant nonfederal activity. This influence must be more than the power to give nonbinding advice to the nonfederal actor. See, e.g., Almond Hill School v. United States Department of Agriculture, 768 F.2d 1030, 1039 (9th Cir.1985) (no federal action where federal officials constituted minority of state advisory board which had power to recommend but not to act); Atlanta Coalition on the Transportation Crisis, Inc. v. Atlanta Regional Commission, 599 F.2d 1333, 1344-47 (5th Cir.1979) (federal funding assistance for local planning process does not constitute major federal action, where all "decisions are entrusted to the state and local agencies"). Rather, the federal agency must possess actual power to control the nonfederal activity. In the Tenth Circuit, we have found major federal action in nonfederal activities, such as the filing of documents with a federal agency, when the filing is a necessary but insufficient step to gain eligibility to apply for federal funds for a nonfederal project, Scenic Rivers Association v. Lynn, 520 F.2d 240, 243-44 (10th Cir.1975), reversed on other grounds, 426 U.S. 776, 96 S.Ct. 2430, 49 L.Ed.2d 205 (1976), and an agency's approval of an Indian tribe's lease of its lands to nonfederal lessees, Davis v. Morton, 469 F.2d 593, 596-98 (10th Cir.1972).
 
 
 97
 The question in the instant case thus becomes whether BLM either has exercised control over the County's major road improvement project or has the authority and duty to do so. The district court held there was major federal action here because BLM undertook several actions to ensure that the County's construction proposal did not exceed the scope of the R.S. 2477 right-of-way through public lands.[17] We are not persuaded, however, that these activities, standing alone, constitute major federal action. These activities were only consistent with BLM's duty to insure that the County does not act outside its authority or beyond the boundaries of its right-of-way. As protector of public lands, BLM no doubt should have attended County planning meetings and reviewed whether the construction fell within the County's right-of-way (including physical inspections and staking, if necessary to check compliance). When it found the County had strayed from its proper right-of-way boundaries, it should have required rerouting, as it did. The monitoring activities to prevent the County from exceeding its authority to improve or constructing outside its right-of-way do not amount to authority to regulate or approve significant aspects of the Burr Trail construction. Except in The Gulch, where the district court required a move to avoid undue degradation of a WSA, the County no longer plans to deviate from its right-of-way; thus BLM no longer has the authority under FLPMA Subchapter V to challenge the County's action on this basis.
 
 
 98
 We do find major federal action, however, in another aspect of BLM's responsibilities under FLPMA as applied to the County's proposed road improvement project. BLM's duty under FLPMA Sec. 603(c) and its regulations, to prevent unnecessary degradation of WSAs from these changes in the right-of-way, injects an element of federal control for required action that elevates this situation to one of major federal action. When dealing with defining boundaries of public lands or existing rights-of-way, BLM has no power to designate alternatives or deny nonfederal actors a course of action. The same is true as to improvements on R.S. 2477 rights-of-way that do not affect WSAs or implicate other federal duties containing some measure of discretion. But as to improvement on rights-of-way affecting WSAs, while BLM may not deny improvements because they impair WSAs, it retains a duty to see that they do not unduly degrade. The IMP regulation we have upheld states: "When it is determined that the rights conveyed can be exercised only through activities that will impair wilderness suitability, the activities will be regulated to prevent unnecessary and undue degradation." Revised IMP, 48 Fed.Reg. at 31,855 (emphasis added). Thus, when a proposed road improvement will impact a WSA the agency has the duty under FLPMA Sec. 603(c) and the regulation to determine whether there are less degrading alternatives, and it has the responsibility to impose an alternative it deems less degrading upon the nonfederal actor. While this obligation is limited by BLM's inability to deny the improvement altogether, it is sufficient, we hold, to invoke NEPA requirements.
 
 
 99
 That BLM may be somewhat reluctant to exercise its regulatory authority under FLPMA Sec. 603(c) does not make any difference. Even if we accept BLM's assertion that its activity amounts to "nonaction" for purposes of NEPA Sec. 102(2)(C), CEQ's regulation directly addresses such failures to act: "[Major Federal] Actions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action." 40 C.F.R. Sec. 1508.18.
 
 
 100
 We are unpersuaded by BLM's reliance on two decisions from other circuits in which no major federal action was found, Defenders of Wildlife v. Andrus, 627 F.2d 1238 (D.C.Cir.1980), and State of Alaska v. Andrus, 591 F.2d 537 (9th Cir.1979) (the "wolf-kill cases"). Both cases involved a decision of the Secretary of the Interior not to exercise its permissive authority under FLPMA Sec. 302(b), 43 U.S.C. Sec. 1732(b), to regulate a state-sponsored wolf-kill on federal land. Wrote one of the courts, "[I]f the agency decides not to act, and thus not to present a proposal to act, the agency never reaches a point at which it need prepare an impact statement." Defenders of Wildlife, 627 F.2d at 1244. The D.C. Circuit concluded, "No agency could meet its NEPA obligations if it had to prepare an environmental impact statement every time the agency had power to act but did not do so." Id. at 1246.
 
 
 101
 In the wolf-kill cases, the federal agency received the following instructions:
 
 
 102
 "[T]he Secretary concerned may designate areas of public lands and of lands in the National Forest System where, and establish periods when, no hunting or fishing will be permitted for reasons of public safety, administration, or compliance with provisions of applicable law."
 
 
 103
 FLPMA Sec. 302(b), 43 U.S.C. Sec. 1732(b) (emphasis added). The D.C. Circuit described the Secretary's duty as "cautious and limited permission to intervene in an area of state responsibility and authority...." Defenders of Wildlife, 627 F.2d at 1250. This characterization derived in part from Sec. 302(b)'s use of the permissive "may" rather than the mandatory "shall." Id. Thus, under Sec. 302(b), the Secretary had the option but not the duty to control nonfederal action.
 
 
 104
 In contrast, the Secretary's nondegradation duty toward WSAs is mandatory. Section 603(c) states: "[I]n managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources...." FLPMA Sec. 603(c), 43 U.S.C. Sec. 1782(c) (emphasis added). CEQ regulations emphasize that the nondegradation duty applies to "grandfathered uses and to all other activities. IMP, 44 Fed.Reg. at 72,015 (emphasis added). "Other activities" include valid existing rights-of-way, which "will be regulated to prevent unnecessary or undue degradation." Revised IMP, 48 Fed.Reg. at 31,855.
 
 
 105
 We are not persuaded by BLM's concerns that a finding of major federal action in this case will chill cooperation between BLM and private rightholders. If a statute requires a federal agency to regulate a local activity, the local actor's refusal to cooperate with the agency is just as irrelevant to a finding of major federal action as is the agency's refusal to act.
 
 
 106
 There is also no merit in the amicus curiae's argument that a finding of major federal action in this case would force BLM to "federalize" all local road projects, regardless of size or impact. First, the authority exists only under FLPMA Sec. 603 and hence applies only to road projects that impact WSAs. Further, major federal action has two components: "major" and "federal." The scope of each project must be evaluated in terms of its impact; as CEQ regulations recognize, "major" federal action does not have a meaning completely independent of significant impact. See 40 C.F.R. Sec. 1508.18. At this stage of the NEPA analysis, we must make a preliminary finding akin to "probable cause," whereby we determine if the project is sufficiently major in scope to trigger NEPA. The project in this case runs ten miles along one WSA and twelve miles along another, with some sections affecting both. It involves realignments, widening, considerable blasting, a significant improvement in the quality of the road surface, and large increases in future traffic. Surely that much work is a major project.
 
 
 107
 B. Requirements for an Environmental Assessment
 
 
 108
 Because private road projects affecting WSAs have been neither categorically exempted from NEPA study requirements nor identified as always requiring a full-fledged environmental impact statement (EIS), the law requires BLM to prepare an environmental assessment (EA). See 40 C.F.R. at Secs. 1501.4(b), 1508.9. An EA is designed to determine if significant impact exists. If it does, then the agency must prepare an EIS before taking the action, see id. at Sec. 1501.4(c); if it does not, then the agency shall issue a finding of no significant impact (FONSI), see id. at Secs. 1501.4(e), 1508.13.
 
 
 109
 The district court found as fact that BLM did not prepare an EA for this project. See 675 F.Supp. at 604. The district court nevertheless excused BLM's failure to prepare an EA:
 
 
 110
 "Neither an EIS nor an Environmental Assessment has been prepared for the present project. Nonetheless, the court is confident that the evidence and testimony presented at trial are sufficient for the court to review. The record before the court included a recitation of the decisions the BLM reached before trial and the facts supporting those decisions."
 
 
 111
 Id. The district court based its conclusion on its review of expert trial testimony, some previous studies,[18] and a privately prepared Preliminary Management Report on archaeological sites along the Burr Trail. The district court found that "BLM's finding of no significant impact was well within the bounds of reasoned decision-making and is supported by persuasive evidence." Id. at 615 (citation omitted).
 
 
 112
 Sierra Club urges that we automatically order a remand to BLM for a specific EA. BLM agrees with Sierra Club that, assuming major federal action, the district court should have remanded to the agency for an EA instead of entering its own findings of no significant impact. BLM urges us to overlook this error, however, contending that Sierra Club waived the right to challenge the error by requesting below that the district court serve as finder of fact on all matters in the case. It bases this argument on the well-accepted principle that "[o]ne may not on review complain of issues, proof, and variance where such errors were committed or invited by complainant...." Deland v. Old Republic Life Insurance Co., 758 F.2d 1331, 1336 (9th Cir.1985).
 
 
 113
 We are not persuaded by the waiver argument. First, we doubt that a private party has authority to waive the procedural requirements NEPA imposes on a public agency. Also, our review of the record yields a different understanding of the Sierra Club request on factfinding. Sierra Club's challenges on the NEPA issues have focused consistently on procedural NEPA violations; Sierra Club's request neither literally nor implicitly waived its procedural challenges.
 
 
 114
 On the merits, we agree that the district court's finding of no significant impact unlawfully usurped the agency's dominion over that issue. CEQ regulations, which are binding on BLM, see Andrus v. Sierra Club, 442 U.S. at 357, 99 S.Ct. at 2341, unambiguously require the preparation of an EIS, or alternatively an EA followed by either a FONSI or an EIS for all major federal actions that have not been categorically excluded. See 40 C.F.R. Sec. 1501.4. The CEQ regulations reflect NEPA's demand that federal agencies take a "hard look" at the environmental ramifications of their major actions. Baltimore Gas & Electric Co., 462 U.S. at 97-98, 103 S.Ct. at 2252. The Supreme Court has emphasized that it is the agency, not the district court, which is to take that hard look:
 
 
 115
 "Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions. The only role for a court is to insure that the agency has taken a 'hard look' at environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.' "
 
 
 116
 Kleppe v. Sierra Club, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976) (citations omitted). See also City of Aurora, 749 F.2d at 1468 ("The initial determination concerning the need for an EIS lies with the agency."). In the general context of judicial review of administrative action, the Supreme Court has addressed the failure of an agency to create a record:
 
 
 117
 "If the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."
 
 
 118
 Florida Power & Light Co. v. Lorion, 470 U.S. 729, 744, 105 S.Ct. 1598, 1607, 84 L.Ed.2d 643 (1985). See also Camp v. Pitts, 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam) (focal point of judicial review should be administrative record, "not some new record made initially in the reviewing court").
 
 
 119
 At least one circuit has held that an agency's failure to prepare an environmental assessment constitutes reversible error which cannot be cured by district court findings. See LaFlamme v. Federal Energy Regulatory Commission, 842 F.2d 1063, 1070 (9th Cir.1988); The Steamboaters v. Federal Energy Regulatory Commission, 759 F.2d 1382, 1393-94 (9th Cir.1985).
 
 
 120
 We agree with the Ninth Circuit's view. Agencies are to perform this hard look before committing themselves irretrievably to a given course of action, so that the action can be shaped to account for environmental values. NEPA Sec. 102(2)(C) requires the agency to consider numerous factors: environmental impact, unavoidable adverse effects, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and irreversible commitments of resources called for by the proposal. These considerations serve to broaden inquiries and expand the range of possible executive action; they fall far outside the court's bailiwick of channeling inquiries and delimiting possibilities into a remedy. Without an administrative record, courts are left to rationalize the agency's decision--a form of review which abandons standards in favor of predilections. "This kind of speculation regarding the basis for an agency's decision not to prepare an EIS is precisely what NEPA was intended to prevent." LaFlamme, 842 F.2d at 1070.
 
 
 121
 Assumption of these duties by the courts also circumvents NEPA's express policy to involve other agencies and the public in the study process. NEPA Sec. 102(2)(C) provides for broad-based participation:
 
 
 122
 "Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5 [APA], and shall accompany the proposal through the existing agency review processes."
 
 
 123
 42 U.S.C. Sec. 4332(2)(C). CEQ regulations implement this mandate by requiring that agencies "shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing [environmental] assessments [required by NEPA]." 40 C.F.R. Sec. 1501.4(b). See City of Aurora, 749 F.2d at 1465. The regulations further state that a finding of no significant impact shall be made "available to the affected public" and that the public and other affected agencies shall be involved in NEPA procedures. See id. at Secs. 1501.4(e)(1), 1506.6. In circumstances where the action is without precedent, the agency must make a FONSI available to the public and at times must allow "public review ... before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin." Id. at Secs. 1501.4(e)(1), 1501.4(e)(2). The preparation of an EIS also entails similar public and interagency participation. See, e.g., id. at Secs. 1503.1(a)(4), 1506.6. This cross-pollinization of views could not occur within the enclosed environs of a courtroom. We must reverse the district court's finding of no significant impact.
 
 C. Sufficiency of Prior Studies
 
 124
 Garfield County argues that BLM satisfied all NEPA requirements prior to trial. In essence, it challenges the district court's finding that no EA was prepared for this project. The County maintains that a 1985 EA which studied several alternative improvement proposals for the Burr Trail does, in fact, constitute an environmental assessment of the County's somewhat different proposal. We cannot find the district court clearly erred in rejecting this position. First, the court reviewed the 1985 EA after seeing the County's proposal and inspecting construction stakes on the Burr Trail. This first-hand inspection creates a strong presumption of correctness which the County's arguments do not overcome. Second, the County's position contradicts BLM's admission that an EA was not prepared for this project.
 
 
 125
 Further, the 1985 EA which the County relies upon lacked accurate data on flora along the impacted area. The district court found that "no plant inventory has been prepared along the Burr Trail and no one knows if any [endangered, threatened, or sensitive] plants are present there." 675 F.Supp. at 614. There was testimony at trial that at least one endangered plant species and perhaps several rare plant species may be found near the Burr Trail. The County argues that Dr. Stanley Welsh, a botanist from Brigham Young University, agreed in his testimony that "the proposed construction would not pose any threat to any listed threatened or endangered species." Brief of Garfield County at 45 (emphasis in Brief). But Dr. Welsh's statement was based on the assumption that no endangered species would be demonstrated to exist along the Burr Trail; Dr. Welsh himself acknowledged that no such demonstration has been made "[b]ecause no one has looked." XXX R. at 71. The County has not demonstrated clear error in the district court's conclusion that a plant survey is necessary. Thus, a new environmental assessment would have to be issued which incorporates valid plant information.[19]
 
 
 126
 The need for an EA is moot, of course, if the district court correctly held that the substantial equivalent of an environmental impact statement has been prepared. The County and BLM do not explicitly make this argument in their briefs, but the County made it in oral argument, and it can be implied reasonably from the County's brief. The County points to several documents which involved some study of various proposals for the Burr Trail: the aforementioned 1985 EA; the Circle Cliffs Combined Hydrocarbon Lease Conversion Draft EIS (Circle Cliffs EIS), Exh. DG-92, Sierra Club Exhibit Add. at tab 39; the Final EIS for Capitol Reef National Park (Capitol Reef EIS), Exh. D-103, Garfield County Exhibit Add. at tab 22; the Transportation Study for Arches, Canyonlands and Capitol Reef National Parks (Transportation Study), Exh. D-54, Garfield County Exhibit Add. at tab 4; the Glen Canyon National Recreation Area Road Study (Glen Canyon Study), Exh. D-37, Garfield County Exhibit Add. at tab 3; and the 1986 Statewide Wilderness Draft EIS, Steep Creek and North Escalante Canyons sections (Statewide EIS), Exh. P-28, Sierra Club Exhibit Add. at tab 12. This court has permitted a related study to serve as the functional equivalent of an EIS, when the other study was "very similar in objectives and in content to an environmental impact statement." State of Wyoming v. Hathaway, 525 F.2d 66, 72 (10th Cir.1975), cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976).
 
 
 127
 Upon review of these documents, however, we conclude that the studies in this case are not the functional equivalent of an EIS.[20]
 
 
 128
 (1) The Capitol Reef EIS, supra, assumes that "[i]mproved roads will retain their existing alignments," Capitol Reef EIS at 37, and thus does not consider the effects of cuts, fills, and blasting. Further, it fails to discuss the environmental consequence of the County's plans to upgrade the Burr Trail, which it admits will result in substantial increased visitation to the South District of the Park, id. at 37, 70, B-4.
 
 
 129
 (2) The Transportation Study, supra, mentions the Burr Trail but discusses it only superficially, except to conclude that "[t]he nature of the Waterpocket Fold--the steep topography and instability of the land--makes it unfeasible to substantially upgrade the Burr Trail; instead, this road will be maintained as a gravel road." Transportation Study at 38. The lack of detail is fatal.
 
 
 130
 (3) The Glen Canyon Study, supra, is somewhat more detailed, insofar as it describes the proposed construction section-by-section. Glen Canyon Study at 31-35. There nevertheless are three shortcomings. First, although a close fit might exist between the County's proposal and the project in the Glen Canyon Study, Garfield County has not demonstrated it to this court. Second, it gives only the most cursory discussion of environmental impacts. Finally, the study candidly admits that further "careful study" is needed in at least two places--Deer Creek and The Gulch. Id. at 33.
 
 
 131
 (4) The Circle Cliffs Draft EIS, supra, is excellent and well might be a resource for the EA and either the FONSI or EIS which we order in this case. Yet it also is insufficient. The Draft EIS is directed toward the development of tar sand deposits in the Burr Trail region. Its discussion of the Burr Trail is too brief to be of use; further, the Burr Trail section addresses impacts which tar sand development would have on the roadway, rather than the impacts which development of the roadway would have on the environment. See Circle Cliffs Draft EIS at 3-45 to 3-49.
 
 
 132
 (5) Finally, the Statewide EIS, while thorough, treats the Burr Trail improvements too superficially. In the Steep Creek section, it acknowledges the County's plans "to improve the Boulder to Bullfrog Road by paving to make it an all-weather road." Statewide EIS at 20. However, its discussion of the impacts is limited to the conclusion that "up to 50 acres could be disturbed due to realignment and paving of the Burr Trail Road." Id. at 22, 28. The North Escalante Canyons section is even less helpful. In that section, both the "All Wilderness" and "Partial Wilderness" alternatives demur on the impact of Burr Trail improvements: "Depending on the final location and realignment of the Burr Trail Road, there could be conflicts between road construction and protection of wilderness values." Id. at 39, 42. The "Partial Wilderness" alternative--which was actually adopted--proposed to set back the WSA boundary by .25 mile from the roadway. Id. at 42. Although such a set-back would reduce environmental impacts, it would not eliminate them; thus detailed study should have been conducted.
 
 
 133
 All of these studies have two overlapping weaknesses: insufficiently detailed discussion of environmental impacts, and the absence of a demonstrated close fit between the County's proposal and the study's particular Burr Trail proposal.
 
 
 134
 The district court, in holding that the functional equivalent of an EIS had been performed, was unable to reach this conclusion without supplementing the aforementioned studies with trial evidence: "Although these reports alone probably would not be the equivalent of a specific EIS for the present project, when they are supplemented by the evidence adduced at trial, the court has no doubt that it has reviewed the substantial equivalent of an Environmental Impact Statement." 675 F.Supp. at 616. Garfield County urges this court similarly to synthesize studies and trial evidence. We refuse, for the same reasons that we could not accept the district court's finding of no significant impact. Environmental study is for the agency to conduct in the field, not for the judiciary to construct in the courtroom. The sufficiency of NEPA review must depend on the completeness of the studies themselves.
 
 
 135
 We order the district court to remand to BLM for an environmental assessment, followed by either a finding of no significant impact or an environmental impact statement. Whatever the shortcomings of the previous studies, on remand BLM will be required to address environmental issues affecting only those areas in which, under the law of the case, it still has authority to act. See League of Women Voters, 730 F.2d at 584 (further study unnecessary when "all agency decisions of any significance had already been made"). BLM's authority is limited to what is relevant to its duty to prevent unnecessary degradation of the WSAs.
 
 
 136
 The extent to which the new EA relies on the 1985 EA is left to BLM's discretion and will be reviewable on a reasonableness standard. See National Helium Corp. v. Morton, 486 F.2d 995, 1002 (10th Cir.1973), cert. denied, 416 U.S. 993, 94 S.Ct. 2405, 40 L.Ed.2d 772 (1974). BLM's discretion further extends to decisions whether previous related studies are sufficiently relevant to the County's proposal to merit adoption into the new EA and either the new FONSI or EIS. See 40 C.F.R. Secs. 1500.4(n) and (o) (authorizing adoption of other agencies' documents to eliminate duplication). We of course do not express any opinion on the actions which BLM should take in response to this further study, except to emphasize that it must be consistent with those aspects of the district court's opinion which have been affirmed.
 
 V
 Injunction
 
 137
 We have issued an order continuing an injunction against construction pending determination of this appeal. But we have held here that the NEPA requirements are triggered only by the duty imposed on BLM to prevent undue and unnecessary degradation of the WSAs. The WSAs adjoin the right-of-way for only a portion of the proposed road improvements. Thus, to the extent it can be determined that the road improvement project would not adversely impact the WSAs, it should be permitted to go forward now. We believe the district court, with input from the parties, is in the better position to determine whether any of the road improvement project that does not touch the boundaries of aWSA could possibly unduly or unnecessarily degrade a WSA. We direct that the injunction against construction continue to at least that part of the improvement project that borders the WSAs. We further direct the district court to dissolve the injunction with respect to those parts of the project which neither border a WSA nor will unnecessarily or unduly degrade a WSA. Upon BLM's compliance with the NEPA requirements in this remand, the County may apply to the district court for complete dissolution of the injunction.
 
 
 138
 This injunction is justified under traditional principles of equity, as applied in the NEPA context:
 
 
 139
 " 'The basis for injunctive relief is irreparable injury and inadequacy of legal remedies.' Amoco Production Co. v. Village of Gambell, 480 U.S. 531, 107 S.Ct. 1396, 1402, 94 L.Ed.2d 542 (1987). 'In each case, a court must balance the competing claims of injury and must consider the effect on each party of granting or withholding of the requested relief.' Id."
 
 
 140
 Save the Yaak Committee v. Block, 840 F.2d 714, 722 (9th Cir.1988). Here the risk of irreparable harm is impossible to assess, because the studies that would quantify that harm are incomplete. Legal remedies are inadequate, however, because permitting construction to proceed before the NEPA studies have been completed would defeat the purpose of undertaking the studies, whose purpose is to make the agency aware of relevant environmental considerations before acting. Finally, the costs to the County appear to be minimal: The injunction is shaped to permit construction to commence in areas which neither border nor threaten Wilderness Study Areas, and construction apparently must be interrupted anyway during the hot, dry summer period.
 
 VI
 Damages
 
 141
 Garfield County seeks damages against Sierra Club under Fed.R.Civ.P. 65(c), which provides "for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." Id. The award of damages under R. 65(c) is left to the discretion of the district court. See State of Kansas ex rel. Stephan v. Adams, 705 F.2d 1267, 1269-70 (10th Cir.1983). The district court denied damages, deciding in its discretion that "plaintiffs raised legitimate environmental concerns having a high public interest and litigated in good faith." 675 F.Supp. at 617. Especially in light of our holding that Sierra Club's NEPA claim is meritorious in part, we cannot conclude that the district court abused its discretion.
 
 
 142
 The County also seeks damages for interference with contractual relations. The district court also denied this claim, finding that "[e]ach side represented a genuine public interest and raised serious questions of law and fact." Id. We cannot find clear error with the district court's finding of fact that Sierra Club had no intent to interfere with the County's construction contract.
 
 
 143
 We reject the County's contentions on both damages questions.
 
 VII
 CONCLUSION
 
 144
 The judgment of the district court is AFFIRMED in part and REVERSED in part. The case is REMANDED for further proceedings in accordance with this opinion.
 
 BARRETT, Senior Circuit Judge, dissenting:
 
 145
 In Wyoming v. Hathaway, 525 F.2d 66, 72 (10th Cir.1975), cert. denied, 426 U.S. 906, 96 S.Ct. 2226, 48 L.Ed.2d 830 (1976), we observed that NEPA "was not intended to force the agency to merely follow out a regimen." Similarly, the Council on Environmental Quality regulations implementing NEPA tell us that "NEPA's purpose is not to generate paperwork--even excellent paperwork--but to foster excellent action." 40 C.F.R. Sec. 1500.1(c). Today we ignore this advice and the excellent results of a lengthy and comprehensive trial.[1] In lieu, we direct the BLM to complete a meaningless paper exercise. I dissent from this conclusion for two reasons. First, the Sierra Club agreed that the district court would serve as the finder of fact. Thus, it should be held to the district court's factual findings. Second, the BLM undertakes no "major federal action" in this case.
 
 
 146
 The district court noted the "interesting" procedural posture of this case. Sierra Club v. Hodel, 675 F.Supp. 594, 602 (D.Utah 1987). Specifically, the environmental plaintiffs asked "the court to be the finder of fact on all factual issues." Id. The district court recognized that the procedural posture with which it was confronted by the plaintiffs' request would require the court to usurp the BLM's function in violation of the doctrine of primary jurisdiction,[2] ] but for the fact that BLM had already made factual findings and a record sufficient for court review. Id. The district court found that the BLM had generated a substantial record both administratively and in the field and that it was appropriate to review the BLM's factual findings and conclusions. Furthermore, the district court concluded that even where an insufficient administrative record exists "referral to the agency may not be appropriate where it would impede expeditious resolution of the case without a corresponding improvement in the quality of the analysis ... [and where] the agency's position on the issue is already clear." Id. at 602 n. 26.
 
 
 147
 Thus, the court also determined that it need not remand the question to the agency for the exhaustion of remedies.[3] The majority chooses to remand to the BLM for compliance with NEPA's procedural requirements without considering these questions. I disagree. One of the paramount questions for our resolution on this record is whether the circumstances here are such that the doctrine of exhaustion must be applied. I would hold that it need not be. I would reach the merits on the record compiled by the agency and the district court. Sierra Club requested that the district court serve as finder of fact on all factual issues, notwithstanding the allegation in its complaint that under NEPA, the BLM's participation in the project constitutes major federal action which significantly affects the environment and therefore requires the preparation of an Environmental Impact Statement. Id. at 599. The defendants did not object. All of the parties freely submitted to a long trial involving a myriad of issues for resolution by the district court. The circumstances here are unusual, exceptional. The record before this court--constituting the record before the district court--covers every conceivable environmental issue which could be brought to bear in the County's plan to upgrade the Burr Trail. And the record reflects that each of these issues was carefully considered and treated by the BLM and the district court. Under these circumstances, I would hold that the parties waived the right to raise the exhaustion requirement and the district court properly exercised its discretion.
 
 
 148
 Those "factual" issues framed by the plaintiffs for the district court's resolution were (1) whether Garfield County has a valid right-of-way, (2) if Garfield county does have a valid right-of-way, must not its scope be narrowly circumscribed by the limited uses it has been put to over the decades, and (3) whether BLM's participation in the County's project constitutes major federal action significantly affecting the environment. These "factual" issues, framed by Sierra Club, were the focus of the district court proceeding which included many environmental reports previously prepared on the Burr Trail and exhaustive trial testimony involving twenty-six witnesses and 250 exhibits. Id. at 615. The district court observed that BLM District Manager Jensen had testified for six days and that the project's chief engineer had testified for five days. Id. The district court concluded that:
 
 
 149
 [R]equiring preparation of an EIS at this time would merely duplicate pastefforts without enhancing the quality of the inquiry. The interests of the court and all the parties are best served by relying upon the resources which have already been prepared.
 
 
 150
 Id. at 616.
 
 
 151
 The record does not reflect that any party objected to the jurisdiction or power of the district court to hear and decide the issues framed or to the presentation of detailed testimony and exhibits. Instead, all parties were willing participants in the procedure pursued by the district court. Yet our decision today ignores the procedural posture of the case below and gives the Sierra Club a second chance to dispute settled facts. Though the plaintiffs asked the district court to serve as the fact-finder, we allow them to abandon that request and force the BLM to revisit these questions.[4]
 
 
 152
 The majority responds that a private party may not have the authority to waive the procedural requirements of NEPA. At 1092. But that is not the question here. We do not enforce NEPA in a vacuum or sua sponte. Sierra Club seeks an injunction against the County's proposal arguing that unidentified environmental impacts will result. The district court and BLM looked for impacts and found none. It seems incongruous that we will recognize the substantial equivalent of an EIS, at 1094; Wyoming v. Hathaway, 525 F.2d at 72--NEPA's most detailed and elaborate environmental document--yet we will not apply similar reasoning to an EA, a much less extensive document. And it is difficult to reason that we would allow Sierra Club to waive the substance of environmental analysis, but not the procedure. Certainly, the district court did not understand the plaintiffs' request to serve as the finder of fact as it is characterized by the majority now.
 
 
 153
 The district court found that the County's proposal would generate no significant environmental impacts. Sierra Club, 675 F.Supp. at 615. Furthermore, it concluded that BLM had made the same finding and that BLM's "finding of no significant impact was well within the bounds of reasoned decision-making and is supported by persuasive evidence." Id. (citation omitted). Yet, because the BLM did not label that finding with a particular title, we are remanding for the preparation of an EA (requiring less analysis and detail that the record before us) and FONSI (without rejecting the district court's similar finding as clearly erroneous).
 
 
 154
 The only result of the decision here will be wasted time and money. We preserve bureaucratic form over environmental substance because the district court's opinion demonstrates that the County's Burr Trail project has been thoroughly studied and that the minor improvements proposed by the County will have no significant environmental impact. Thus, any remand to the BLM will be a meaningless paperwork exercise with its attendant expenditure of untold hours of work by BLM personnel in its preparation and presentment. There is no suggestion that BLM will give any consideration to an environmental issue not already presented to and addressed by the district court and in the record before us on appeal. Thus, we can safely conclude that as a result of our remand, the BLM will ultimately issue the required NEPA documents which will, in turn, trigger another round of litigation.
 
 
 155
 There is a second, equally important reason why our decision today is incorrect. The federal action we review here does not trigger the procedural requirements of NEPA. BLM is involved in this project in two ways. It must determine that the County's proposal is within the scope of its right-of-way, and it must determine that the proposal does not unnecessarily degrade the adjacent WSAs. The district court found major federal action in BLM's activities related to the right-of-way. Sierra Club, 675 F.Supp. at 612; Slip op. at 1090. The majority properly rejects this conclusion. Id. at 1090. Then, inexplicably, the majority finds federal action in BLM's duty to protect the integrity of wilderness study areas. After careful review, I must reject those conclusions. The majority does not recognize, as it must, that in a practical sense there is no difference in the BLM's responsibility to monitor the County's right-of-way construction and protecting the WSAs. BLM's obligations are virtually identical in either case. BLM will, as a practical matter, implement its responsibility in protecting the WSAs in exactly the manner it would meet its responsibility to monitor the right-of-way, i.e., by meeting with county planners, expressing opinions, monitoring construction progress, inspecting the construction and requiring legal modifications. See Id. at 1090, n. 17. Furthermore, the legal standards imposed on BLM in the implementation of these duties are indistinguishable: BLM must assure that the County's use of the right-of-way is "reasonable and necessary" while WSAs must be protected from "undue and unnecessary degradation."
 
 
 156
 The majority attempts to distinguish the two responsibilities by suggesting first, that the latter duty is mandatory. Id. at 1091, and second, that it involves a greater exercise of control and discretion. Id. at 1090. Neither argument is persuasive.
 
 
 157
 FLPMA imposes a mandatory duty on BLM to protect WSAs. But the duty to monitor the County's right-of-way is apparently no less mandatory. Describing the BLM as "protector of public lands," the majority concedes that the BLM has a "duty to insure that the County does not act outside its authority or beyond the boundaries of its right of way." Slip op. at 1090. The district court proceeded under the same assumption. Sierra Club, 675 F.Supp. at 606. On this question, I submit that there is simply no principled difference between the two federal responsibilities, and there is no major federal action.
 
 
 158
 But the majority also suggests that the duty to protect WSAs "injects an element of federal control for required action that elevates this situation to one of major federal action." Slip op. at 44. Again, this reasoning ignores the fact that the same elements are present in BLM's decisions regarding the County's right-of-way. First, there are elements of discretion. The width of the right-of-way is "that which is reasonable and necessary." Sierra Club, 675 F.Supp. at 606. And, as the district court noted, "[w]hether the proposed construction is actually reasonable and necessary is for the BLM to decide." Id. The discretion in the standard for protecting WSAs, "undue and unnecessary degradation," is virtually the same. Similarly, both responsibilities contain elements of control. When BLM reviewed the County's stakes it found ten places "where the proposed road would not adjoin the old road. In these ten places the county would have to either pull back so as to adjoin the present road, or apply for a right-of-way amendment." Sierra Club, 675 F.Supp. at 603. BLM has the power to control the County's use of the right-of-way and has exercised that control.
 
 
 159
 In this case, BLM's duty to protect the WSAs adjacent to the Burr Trail does not rise to the level of major federal action. The majority's conclusion to the contrary is tied by tenuous legal threads and ignores its own analysis of BLM's right-of-way duties. Without the requisite major federal action, there is no need to remand this decision to BLM for the preparation of an EA.
 
 
 160
 I conclude that this case presents one of those exceptional circumstances justifying waiver of the exhaustion of administrative remedies doctrine and affirmance of the district court in all respects other than its order directing the county to submit an application to BLM for a FLPMA permit to deviate from the existing right-of-way in the Gulch. Such a deviation is not mandatory and the district court erred in so directing. Should the County determine to relocate the existing right-of-way, such an activity would trigger the need for a FLPMA permit and constitute "major federal action." The decision on how to proceed, however, is that of the County alone.
 
 
 161
 I would affirm the district court except for its order that the County apply to BLM for a FLPMA permit to alter the right-of-way in the Gulch.
 
 OPINION ON REHEARING
 
 162
 Before LOGAN, BARRETT and SEYMOUR, Circuit Judges.
 
 
 163
 PER CURIAM.
 
 
 164
 Sierra Club's petition for rehearing makes an argument that major federal action is created by the Secretary's duty under FLPMA Sec. 302(b), 43 U.S.C. Sec. 1732(b), to prevent unnecessary or undue degradation of all public lands. On appeal, Sierra Club argued that the nondegradation standard implicated major federal action only in the context of WDAs pursuant to FLPMA Sec. 603(c), 43 U.S.C. Sec. 1782(c). See Reply and Answer Brief of Sierra Club at 28-29. Not until its petition for rehearing did Sierra Club raise the issue whether Sec. 302(b)'s nondegradation standard for all public lands creates major federal action. Petitions for rehearing under Fed. R. App. P. 40(a) are permitted to enable parties to notify, and to correct, errors of fact or law on the issues already presented; they are not meant to permit parties to assert new grounds for relief. See Jamestown Farmers Elevator, Inc. v. General Mills, Inc., 552 F.2d 1285, 1295-96 (8th Cir. 1977) (appellant may not raise issue in petition for rehearing not argued as part of original appeal); Mitchell v. Greenough, 100 F.2d 1006, 1006 (9th Cir.) ("A party cannot on petition for rehearing shift his position"), cert. denied, 306 U.S. 659, 598 S.Ct. 788, 83 L.Ed. 1056 (1939); cf. United States v. Smith, 781 F.2d 184 (10th Cir. 1986) (prohibiting government from using petition for rehearing to raise an issue it had previously conceded).
 
 
 165
 Additionally, Judge Barrett would grant Garfield County's request to clarigy our position relative to what is "unnecessary or undue degradation" as applied to the Wilderness Study Areas, and he agrees with the County's contention that its performance of construction activities within the scope of its right-of-way does not require a BLM environmental analysis.
 
 
 
 [1]
 R.S. 2477 read in its entirety: "Sec. 8. And be it further enacted, That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted."
 
 
 [2]
 The County plans eventually to improve the entire sixty-six-mile trail, as well as to pave it. These plans are not part of the current proposal
 
 
 [3]
 The North Escalante Canyons area formally is known as an "instant study area." This title refers to the fact that it was designated as a natural or primitive area prior to November 1, 1975, and the Secretary was required to present a recommendation on the area's wilderness status to the President by July 1, 1980. See BLM Wilderness Inventory Handbook at 3 (1978), Sierra Club Exhibit Add. at tab 19. There is no substantive difference, for purposes of this case, between an instant study area and a wilderness study area. For brevity, we will refer to both the Steep Creek and North Escalante Canyons areas as wilderness study areas
 
 
 [4]
 On appeal, defendants concede Sierra Club's standing to bring this suit. We find no merit in the argument of amicus curiae Utah Association of Counties in this regard
 
 
 [5]
 "Roadless" is defined in the Department of the Interior regulations:
 "(e) 'Roadless area' means a reasonably compact area of undeveloped Federal land which possesses the general characteristics of a wilderness and within which there is no improved road that is suitable for public travel by means of four-wheeled, motorized vehicles intended primarily for highway use."
 
 
 [43]
 C.F.R. Sec. 19.2. "Wilderness characteristics" are listed in Sec. 2(c) of the Wilderness Act:
 "c) Definition of wilderness
 A wilderness, in contrast with those areas where man and his own works dominate the landscape, is hereby recognized as an area where the earth and its community of life are untrammeled by man, where man himself is a visitor who does not remain. An area of wilderness is further defined to mean in this chapter an area of undeveloped Federal land retaining its primeval character and influence, without permanent improvements or human habitation, which is protected and managed so as to preserve its natural conditions and which (1) generally appears to have been affected primarily by the forces of nature, with the imprint of man's work substantially unnoticeable; (2) has outstanding opportunities for solitude or a primitive and unconfined type of recreation; (3) has at least five thousand acres of land or is of sufficient size as to make practicable its preservation and use in an unimpaired condition; and (4) may also contain ecological, geological, or other features of scientific, educational, scenic, or historical value."
 16 U.S.C. Sec. 1131(c).
 
 
 [6]
 Like the reviewability argument just discussed, this issue was not raised in the district court. But because the existence of a private right of action similarly goes to the subject matter jurisdiction of the court, see Oldfield v. The Athletic Congress, 779 F.2d 505, 508 (9th Cir.1985), we treat the issue to the extent necessary to resolve our authority to decide the merits of the appeals. The procedural context of the argument is troublesome because BLM raises it on behalf of Garfield County; however, since the County and BLM have cooperated closely in this case, we treat the argument as if the County expressly joined in it
 
 
 [7]
 WSAs are "roadless areas of five thousand acres or more [or] roadless islands of the public lands ... having wilderness characteristics described in the Wilderness Act of September 3, 1964 (78 Stat. 890, 16 U.S.C. Sec. 1131 et seq.)...." FLPMA Sec. 603(a), 43 U.S.C. Sec. 1782(a)
 
 
 [8]
 The Burr Trail comprises the south boundary of the Steep Creek WSA for approximately ten miles and the north boundary of the North Escalante Canyon WSA for approximately twelve miles
 
 
 [9]
 The "scope" of a right-of-way refers to the bundle of property rights possessed by the holder of the right-of-way. This bundle is defined by the physical boundaries of the right-of-way as well as the uses to which it has been put
 
 
 [10]
 We have considered amicus curiae William J. Lockhart's argument that the Taylor Grazing Act of 1934, 48 Stat. 1269, codified as amended at 43 U.S.C. Sec. 315 et seq., and particularly the amendments to section 7 thereof by the 1936 Act, 49 Stat. 1976, Sec. 2, prevented the County from acquiring a right-of-way. We read the district court's opinion as finding that sufficient use of the Burr Trail existed in 1934 to constitute an R.S. Sec. 2477 right-of-way and that section 6 of the 1934 Act, 43 U.S.C. Sec. 315e, preserved existing rights-of-way. We agree with that conclusion and see nothing in the 1936 amendment to convince us that it should affect our conclusions here
 
 
 [11]
 Sierra Club also argues that the Nevada and California BLM State Offices have adopted the "actual construction" standard. These opinions are not binding in Utah
 
 
 [12]
 Given the longstanding regulatory interpretation, we are not persuaded that the law of this case reaches us in such an unsettled posture as to require the Wilson analysis. This line of cases generally addresses situations in which a federal court must cut federal common law from whole cloth. See, e.g., Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943). We make the Wilson analysis to fully meet Sierra Club's arguments and to demonstrate that it does not dictate a different result than that we reach without it
 
 
 [13]
 See, e.g., Girves v. Kenai Peninsula Borough, 536 P.2d 1221, 1226-27 (Alaska 1975); Tucson Consolidated Copper Co. v. Reese, 12 Ariz. 226, 100 P. 777, 778-79 (1909); McRose v. Bottyer, 81 Cal. 122, 22 P. 393, 394-95 (1889); Nicolas v. Grassle, 83 Colo. 536, 267 P. 196, 197 (1928); Tholl v. Koles, 65 Kan. 802, 70 P. 881, 882-83 (1902); Moulton v. Irish, 67 Mont. 504, 218 P. 1053, 1054 (1923); Streeter v. Stalnaker, 61 Neb. 205, 85 N.W. 47, 48 (1901); Wilson v. Williams, 43 N.M. 173, 87 P.2d 683, 685 (1939); Wallowa County v. Wade, 43 Or. 253, 72 P. 793, 794-95 (1903); Pederson v. Canton Township, 72 S.D. 332, 34 N.W.2d 172, 174 (1948); Lindsay Land and Live Stock Co. v. Churnos, 75 Utah 384, 285 P. 646, 648 (1930); Smith v. Mitchell, 21 Wash. 536, 58 P. 667, 668 (1899); Town of Rolling v. Emrich, 122 Wis. 134, 99 N.W. 464, 465 (1904); Hatch Bros Co. v. Black, 25 Wyo. 109, 165 P. 518, 519-20 (1917)
 The perfection of an R.S. 2477 right-of-way admittedly is a different issue than its scope. However, all of the above-cited cases concern the conflict between an alleged R.S. 2477 right-of-way and a competing claim of right to the land. The cases subsume the question of scope into the question of perfection; and indeed a critical part of many of the state law definitions of perfection included the precise path of the purported roadway. See, e.g., Wilson v. Williams, 43 N.M. 173, 87 P.2d 683, 684 (1939).
 
 
 [14]
 FLPMA Sec. 701(a) recognizes rights-of-way "existing on the date of approval of this Act [October 21, 1976]." See 43 U.S.C. Sec. 1701 Savings Provision (a). See also FLPMA Secs. 509(a), 701(h), 43 U.S.C. Secs. 1769(a), 1701, Savings Provision (h)
 
 
 [15]
 FLPMA Sec. 603(c) provides in relevant part:
 "(c) Status of lands during period of review and determination
 During the period of review of such areas and until Congress has determined otherwise, the Secretary shall continue to manage such lands according to his authority under this Act and other applicable law in a manner so as not to impair the suitability of such areas for preservation as wilderness, subject, however, to the continuation of existing mining and grazing uses and mineral leasing in the manner and degree in which the same was being conducted on October 21, 1976: Provided, That, in managing the public lands the Secretary shall by regulation or otherwise take any action required to prevent unnecessary or undue degradation of the lands and their resources or to afford environmental protection."
 43 U.S.C. Sec. 1782(c).
 
 
 [16]
 The district court apparently believed that the IMP and its progeny left open the question whether a right-of-way could be extended within its legal scope as defined by state law if the extension impaired a WSA. The court engaged in a complicated analysis of this question, ultimately deciding that the County could make reasonable and necessary improvements of the right-of-way, even if the improvements might impair the adjacent WSAs' suitability for wilderness designation. See 675 F.Supp. at 609-10. Sierra Club challenges the district court's analysis and conclusion
 Without following the district court's approach, we adopt its result. The IMP and the Revised IMP manifestly permit the impairment of WSAs through the reasonable exercise of valid existing rights. The right to make reasonable and necessary improvements within the boundaries of the right-of-way is part of the County's valid existing rights in the Burr Trail.
 
 
 [17]
 Based on evidence and testimony adduced at trial, the district court expressly found that BLM has undertaken several actions:
 (1) attending Garfield County planning meetings;
 (2) expressing an opinion, prior to this lawsuit, that the construction falls within the County's right-of-way;
 (3) volunteering to monitor the progress of the construction to assure that the construction remain within the right-of-way and, with prodding from the district court, actually doing so;
 (4) physically inspecting the construction site after the County (in response to a district court order) placed stakes along the Burr Trail to identify the boundaries of the project;
 (5) concluding in a written report, based on its inspection of the staking, that the project falls within the right-of-way;
 (6) requiring the County to reroute the project in the ten areas along the trail where the improvements fell outside the right-of-way (the County complied, rather than attempting to obtain permission for the ten deviations through the FLPMA permit process, Subchapter V, 43 U.S.C. Secs. 1761-71);
 (7) concluding in the same report that the project would not impermissibly intrude on WSAs.
 
 
 [675]
 F.Supp. 603-04
 
 
 [18]
 The previous studies included a Statewide Wilderness Draft EIS, a Fish and Wildlife Service Biological Opinion, a 1985 EA which considered five alternative proposals for Burr Trail improvements, and a FONSI which ostensibly resulted from the 1985 EA but actually concerned a new and much less intrusive project, called the "Mott Proposal". The Mott Proposal, which was suggested by the Director of BLM, varied significantly from the County's proposal in that it would have required virtually no realignment of the existing roadway
 
 
 [19]
 The County challenges the district court's order that "the identified botanical studies be conducted to the BLM's satisfaction...." 675 F.Supp. at 618. The issue is moot, since BLM already has secured the performance of these studies
 
 
 [20]
 Normally we review district court factual findings by the clearly erroneous standard. To the extent, however, that subsidiary factual findings in NEPA cases were based exclusively on the administrative record, "we have greater legal freedom to differ with the district court's ultimate characterization of agency behavior." Sierra Club v. Marsh, 769 F.2d 868, 872 (1st Cir.1985)
 
 
 [1]
 This case involved twenty-five (25) days of trial on the merits. In addition, eight (8) days were involved in hearings on environmental plaintiffs' Motion for Preliminary Injunction. Thus, the district court heard the parties out over a period in excess of six weeks
 
 
 [2]
 The doctrine of primary jurisdiction provides that where the law vests in an administrative agency the power to consider, treat and decide an issue, the courts will refrain from entertaining the case until the agency has fulfilled its statutory obligation. California v. Federal Power Commission, 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962); American Min. Congress v. Thomas, 772 F.2d 617, 626 (10th Cir.1985); Sunflower Elec. Coop. v. Kansas Power & Light Co., 603 F.2d 791 (10th Cir.1979); Nickol v. United States, 501 F.2d 1389, 1390-91 (10th Cir.1974)
 
 
 [3]
 Exhaustion of remedies is a corollary to the primary jurisdiction doctrine and normally requires that the agency process be exhausted before the courts will act. "The doctrine provides 'that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." McKart v. United States, 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) (quoting Myers v. Bethlehem Shipbuilding Corp., 303 U.S. 41, 50-51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938)). But the doctrine is not to be applied blindly in every case. It is a matter within the sound discretion of the courts. See Id. at 200-01, 89 S.Ct. at 1666; Rocky Mountain Oil and Gas Ass'n v. Watt, 696 F.2d 734 (10th Cir.1982)
 
 
 [4]
 The only explicit request made by the Sierra Club to the district court that NEPA requirements be studied by BLM was in plaintiffs' Cross Motion for Summary Judgment. Plaintiffs asked the district court to declare that Garfield County's "proposed construction activities are subject to the requirements of the National Environmental Policy Act" and requested that BLM be required to prepare an environmental impact statement, or alternatively, an environmental assessment. (R., Vol. II, Tab 77 at 2). This request, however, was simply an alternative, inasmuch as Sierra Club, et al., insisted that Garfield County did not have a valid claim of right-of-way upon the Burr Trail. Further, plaintiffs contended that if the district court found that Garfield County did have a valid right-of-way, it should be limited to its present alignment and width of the road and those uses permitted under R.S. 2477. There is no further request of Sierra Club in this record that any environmental issues be remanded to the BLM. Thus one must ask: Why did the parties present exhaustive trial testimony and exhibits dealing with environmental issues involving the Burr Trail project to the district court if the parties did not intend that the district court decide them?